390 A.2d 814

**James M. SHOUP**

v.

**Donna J. SHOUP, Appellant.**

Superior Court of Pennsylvania.

Submitted April 11, 1977.

Decided July 12, 1978.

264

George H. Hoffman, Pittsburgh, for appellant.

Frank P. Krizner, Butler, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PER CURIAM:

The six Judges who decided this case being equally divided the order is affirmed.

PRICE, J., files an opinion in support of affirmance in which JACOBS, P. J. and VAN der VOORT, J., join.

SPAETH, J., files an opinion in support of remand in which CERCONE, J., joins; HOFFMAN, J., concurs in the result.

HOFFMAN, J., dissents from an affirmance of the lower court's order granting custody to the father because the record is insufficient to support an order disrupting the children's relationship with their mother.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

IN SUPPORT OF AFFIRMANCE

PRICE, Judge:

This appeal by the mother of two boys, James, age 12 and Jeffrey, age 10,[1] is from the lower court's order granting custody to the father. Because we find the issues raised on appeal to be meritless, we would affirm the order of the court below.

■ Appellate courts enjoy a broad scope of review in custody matters. *Davidyan v. Davidyan*, 230 Pa.Super. 599, 327 A.2d 145 (1974). Thus, we are not bound by deductions and inferences of the trial court, *Commonwealth ex rel. Bowser v. Bowser*, 224 Pa.Super. 1, 302 A.2d 450 (1973), nor are we compelled to accept any findings not based on competent evidence. *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665 (1974). However,

> "we have recognized that the trial judge is in a position to evaluate the attitudes, sincerity, credibility, and demeanor of the witness. Because we are not in such a position, we have recognized that a trial judge's determination of custody should be accorded great weight. [Citations omitted] Only where we are constrained to hold that there was a gross abuse of discretion should an appellate court interfere with the decisions of the hearing judge." *Commonwealth ex rel. Rainford v. Cirillo*, 222 Pa.Super. 591, 597–98, 296 A.2d 838, 841 (1972).

The record in the instant case does not reflect any abuse of discretion which would warrant disturbing the lower court's order.

The record indicates that the parties were divorced on March 17, 1972. Appellant, originally awarded custody of the boys on January 23, 1973, has enjoyed continuous custody and, according to the record, has cared adequately for the children since that time. The 1973 order granted appellee liberal visitation rights. On January 22, 1976, appellee filed a petition for custody. Following in camera questioning of

1. These were the boys' ages at the time of the lower court's hearing on March 31, 1976.

▌▌▌▌▌▌▌▌▌▌▌

the boys and a hearing at which both appellant and appellee testified, the lower court awarded appellee custody.

■ Appellant's first contention is that the evidence established that the appellee is unfit to assume custody.

"It is now beyond dispute that the sole issue to be decided in a custody proceeding between contending parties is the best interests and welfare of the child. Act of June 26, 1895, P.L. 316, § 2, 48 P.S. § 92 (1965); *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Commonwealth ex rel. Daven,* 298 Pa. 416, 148 A. 524 (1930)." *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 294, 368 A.2d 635, 637 (1977).

In determining a child's best interest, one must look to the child's physical, intellectual, moral and spiritual well-being. *Commonwealth ex rel. Holschuh v. Holland-Moritz, supra; Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879 (1977); *Jones v. Kniess,* 249 Pa.Super. 134, 375 A.2d 795 (1977).

Testimony in this case revealed that the boys love both of their parents. The father has remarried and lives with his second wife and their child in a house just five hundred yards from the house which appellant and her sons have shared since the divorce. The boys are therefore able to visit their father frequently. In his home appellee has furnished a room for the boys containing twin beds, desks, books, a television and clothes. The father, an avid hunter, has instructed the children on the use of guns and on gun safety, and he often enjoys outings with them. Appellee also purchased small Honda trail bikes for the boys, the use of which their mother opposes. The father and his wife faithfully attend a Bible Baptist Church and have on occasion taken Jeffrey and James to services there. Appellee and his wife appear to be very firm in their religious convictions.

There was testimony that the mother does not attend church or send the children. Because the mother works, the children have no adult supervision for a short time in the

mornings before school and again in the evening when they return from school. During the summer months, the boys remain unsupervised throughout the day, except during lunch hour when their mother is with them. During many of these "lulls" the children go to their father's house. Because appellee's wife is not working, she is often available to the children even if their father is not.

Appellant asserts that appellee is unfit because he permits the children to have access to guns and ammunition contained in his gun collection. Appellant contends that appellee has evidenced a "devil-may-care" attitude regarding gun safety. The record, however, reflects the opposite. Both children showed an awareness of the seriousness and danger of handling guns and testified that their father instructed them extensively on gun safety. Both have successfully completed hunter safety courses. However, there was one incident in which the children constructed a homemade bomb from materials found at a shooting range, which they visited in the company of their father. The mother discovered the device and summoned the father. Fortunately no one was hurt. This single prank, in the face of the father's repeated careful instruction on gun safety, does not merit a finding of the father's unfitness.

Appellant also objects to the father's taking the boys to see the movie, *The Exorcist*. Appellee testified that he and his wife and the boys had discussed seeing the movie. Appellee felt the boys were mature enough to handle it and felt they should learn of the power of Satan. Although James testified that he liked the movie and it did not scare him, appellant testified that Jeffrey had nightmares and that both boys were placed under "severe emotional strain." The lower court did not so find nor can we so conclude from the record.

The fact that appellant does not like the activities that appellee engages in with his children does not render him unfit. The lower court found that the isolated incidents of making the bomb and viewing *The Exorcist* did not

establish that the children's best interests would not be served by the father's custody.

Appellant's second contention is that had each child's stated preference for his father been properly scrutinized, the court would have realized that their decisions were clouded by material advantages provided by the father. It is the law of this Commonwealth that a child's preference, although not controlling, is a factor to be carefully considered, so long as it is based on good reasons. *Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977). The child's maturity and intelligence are to be considered. *Commonwealth ex rel. Holschuh v. Holland-Moritz, supra.* James said he wished to live with his father because his father takes better care of him, and "he doesn't have any boyfriends coming and hitting us sometimes." (N.T. 5.) Jeffrey said he wanted to live with his father because his mother worked and therefore no one was at home after school to take care of him. The court was impressed with the honesty and validity of the stated reasons for the boys' preferences. The court recognized that even if the ten year old might not be considered mature enough to have his preference carry much weight, the fact that siblings should be raised together, absent a compelling reason to the contrary, *In re Custody of Myers*, 242 Pa.Super. 225, 363 A.2d 1242 (1976), would dictate that the brothers both reside with their father. We would find that the lower court properly weighed the children's preferences.

Appellant finally argues that the "tender years" doctrine is applicable. In light of *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977), this argument is without merit.

We would affirm the order of the lower court.

JACOBS, P. J., and VAN der VOORT, J., join in this opinion.

## OPINION IN SUPPORT OF REMAND

SPAETH, Judge:

This is an appeal from an order awarding custody of James, age 12, and Jeffrey, age 10, to their father.[1] Since I find that the testimony was insufficient to support the lower court's order, I would remand for an additional hearing.

James and Donna Shoup were divorced in March 1972. Since the divorce the mother has taken care of both boys; she was awarded custody in January 1973. The mother is employed full-time, as is the father. However, the father remarried in July 1976, and his new wife stays at home and cares for their child, who was almost one and a half years old at the time of the hearing.

It is well settled that in a custody dispute between parents the court's paramount concern is to determine what award will be in the best interest of the child. *Commonwealth ex rel. Parikh v. Parikh*, 449 Pa. 105, 107–8, 296 A.2d 625, 627 (1972); *Cochran Appeal*, 394 Pa. 162, 145 A.2d 857 (1958); *Commonwealth ex rel. Graham v. Graham*, 367 Pa. 553, 80 A.2d 829 (1951); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa.Super. 229, 312 A.2d 58 (1973). The lower court, however, awarded custody to the father primarily on the basis that both boys expressed a preference to live with their father.

It is true that a child's stated preference may be sufficient to support a conclusion that a change of custody is warranted. *Carlisle Appeal*, 225 Pa.Super. 181, 310 A.2d 280 (1973). It is also true that as a child grows older more weight should be given to the child's preference. *Tomlinson v. Tomlinson*, 248 Pa.Super. 196, 374 A.2d 1386 (1977); *Williams v. Williams*, 223 Pa.Super. 29, 296 A.2d 870 (1972). However, a court must not simply accept the child's statement of preference; instead the court must critically examine the reasons underlying the child's statement, for a too ready acceptance of the statement would be in effect an abdication by the

1. These were the respective ages of the children at the time of the hearing, on March 31, 1976.

court of its responsibility to decide for itself what will be in the child's best interest. In conducting its examination of the reasons underlying the child's statement the court must proceed on the basis of a comprehensive record, that is, a record that includes evidence that will enable the court to understand the motivation behind the child's statement of preference, and to envision what it would be like for the child to live with one parent as compared with the other. Only thus may the court arrive at a sound determination of what is in the child's best interest. *Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1946); *Commonwealth ex rel. Grillo v. Shuster, supra.*

The mother contends that the boys' best interest will not be served by awarding custody to their father, who she contends has a "devil-may-care attitude." The father is an avid hunter and gun collector, with a collection of 25 to 30 guns. The key to this collection hangs on a nail next to the cabinet. The father has bought a gun for each boy and takes the boys hunting. On New Year's Eve, the boys and their father join in what is allegedly a community custom— the shooting of guns into the air. The mother testified that she does not like guns and does not feel that 10 and 12 year old children should handle them. She also testified that she did not think that the boys had been sufficiently taught how to handle guns safely. N.T. 82. In this regard, there was one "incident" in which the boys constructed a bomb from materials gathered while on a shooting expedition with their father. When the mother became aware of the situation, she immediately called the boys' father, who came by a day or so later, and taking the "bomb" into the driveway, lit it, causing an explosion. N.T. 84.

Another incident involved taking the boys to see the movie, *The Exorcist.* The father testified that "it was a good movie in the fact that it does show the possibility and the power of the devil that, you know, is in everyday life that people won't accept  .  .  .  I believe that some

people can be possessed by the devil." N.T. 57. James testified that the movie did not scare him, and the lower court found that it could not "conclude that this [seeing the movie] has or will effect [*sic*] their spiritual well-being." Lower Court Opinion at 2. However, the mother testified to the following reaction by the boys:

> The boys went to bed at their regular time. About half an hour later Jeffrey came out to me and said that he was going to be sick. He couldn't stop thinking about that movie, and he couldn't get to sleep. He was crying, he was very definitely upset. About an hour later after that Jimmie also came out, said he was having nightmares, he couldn't get the movie off his mind . . . Jeffrey was almost physically sick. In fact, Jeffrey still tells me that he cannot stop thinking about that movie.
> N.T. 88.

One more incident should be mentioned. The father purchased motorbikes for the boys, and once, while riding them, the boys were stopped by a police officer. James testified that their father instructed them as follows: "He said if the policeman comes, don't let him catch you, because he'll fine you and confiscate the motorcycles." N.T. 15.

None of this evidence shows that the father is an unfit parent. It does, however, lead one to inquire whether living with their father would be better for the boys than living with their mother.

The mother works full-time to support herself and the boys, and she described her home as follows:

> We have a four-bedroom home, two bathrooms, a large yard, the boys have a bedroom they share a bedroom, by choice. We have a room set up for them with an air hockey table. Jimmie's bench press and his weights, their record player and records. It's just a room where they can bring their friends to entertain them.
> N.T. 70.

The father pays $175 per month for the support of the boys (or approximately $22 per week per child). Although the father testified that it is difficult for him to make those payments, N.T. 63–64, it appears that in addition to his gun collection, he owns two boats, N.T. 66, and not only has he bought the guns and motorbikes, but also a complete set of clothing for each boy. N.T. 46. The father described the facilities he has for the boys as follows:

> They have their own room. They have their new furniture. They have twin beds with their buffet type things. They have desks, their T.V.'s, everything that one could think of. They have their own bicycles. We've completely had everything that they, I think a young boy would need for growing up, encyclopedias, books, everything and anything.
>
> N.T. 39.

It appears from this evidence that the boys' stated preference may be attributed, at least in part, to the material advantages and exciting activities provided by their father. *See Tomlinson v. Tomlinson, supra.* However, the boys did give some specific reasons for their preference.

When asked why he would prefer to live with his father, James replied: "Because I think he takes better care of me and he doesn't have any boyfriends coming and hitting us sometimes." N.T. 5. This statement was relied upon by the lower court in its opinion. If in fact the mother has boyfriends who do hit the boys, this certainly would be a fact of great importance. However, when James made the statement he was not asked what he meant; a twelve year old's narration is not to be accepted at face value. Does "any boyfriends" in fact refer to more than one person? What does "boyfriend" mean, and "hitting", and "sometimes"? The mother testified that although she has some male friends, she has had but one boyfriend for the past four years. N.T. 86, 94. She was never asked whether so far as she knew any of her friends had ever hit the boys, and

therefore was never given an opportunity to respond to James's allegation.

When asked why he would prefer to live with his father, Jeffrey replied: "Because after school there's no one to take care of us whenever we get home." N.T. 29. In this regard James testified that their mother leaves for work about 7:45 in the morning, while their bus picks them up at 8:30, and that they come home at 4:00, while their mother does not come home until 4:45. N.T. 6. He also testified that during the summer they were all alone. N.T. 7. The lower court slightly exaggerated this testimony, stating that the boys were alone all summer, and for approximately an hour in the mornings and again in the afternoons. Lower Court Opinion at 2. The court did not comment on the mother's testimony. She testified that she leaves the house at 7:50, that the bus picks the boys up in front of the house at 8:05, N.T. 71, and that they come home at 4:10, while she comes home at 4:40 p.m. N.T. 72. She also explained that she and the boys have established that either she calls them or they call her when they get home, and that she is only seven minutes from the house. N.T. 73. In regard to the summer, the mother testified that the father had the children for three weeks, that her mother stayed with them for one week, that she spent her two weeks vacation with the boys, and that the rest of the time her neighbor, across the street, kept an eye on them. N.T. 74, 90. Finally, the mother testified that her mother was about to retire and move in with her and the boys "next month." N.T. 72. Of course, if this has in fact occurred, the problem of lack of supervision, both during the school year and the summer vacation, would evidently be resolved without the necessity of a change of custody. Thus, although the length of time the boys are left unattended is certainly of great importance, so far as appears the lower court did not consider, at least it does not comment upon, the mother's testimony regarding just how long that length of time was. This absence of comment is the more striking in view of the fact that the court never indicated that it doubted the mother's credibility.

As in *Tomlinson v. Tomlinson, supra,* it is the father who seeks to change the status quo. "We recently said that '[t]here has been increasing attention, both by the courts and in psychiatric and psychological literature, to the importance in custody cases involving very young children, of not disrupting an established relationship.'" *Sweeney v. Sweeney,* 241 Pa.Super. 235, 244, 361 A.2d 302, 307 (1976), quoting *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976). Here, when examined as a whole, the record is insufficient to support an order disrupting the boys' established relationship with their mother. Partly this is so because of the various deficiencies in the record discussed above, which lead to the conclusion that the boys' stated preference may have been too readily accepted. Of greater importance than these deficiencies, however, is the fact that the father's new wife did not testify at the hearing. If the father is to be awarded custody, it will be she, not he, who will spend most of the time with the boys. Therefore, critical to a determination of what is in the boys' best interest is evidence of what sort of person the new wife is, whether she wants the boys, and how the relationship between the boys and her would be affected by the attention she must give to her own child.

Accordingly, the record should be remanded for further proceedings, in the course of which the lower court should receive further evidence, especially from the father's new wife, but also regarding whether in fact any of the mother's friends have hit the boys, and what length of time the boys would be unsupervised if left in the mother's custody. In appraising this evidence, and in deciding what is in the boys' best interest, the court should bear in mind such considerations as the importance of continuity, the effect of the new child in the father's household, and the importance of not encouraging parents to try to buy their children's affection.

CERCONE, J., joins in this opinion.

HOFFMAN, J., concurs in the result.