496 A.2d 1

**CONSTANT A., Appellant,**

**v.**

**PAUL C.A.**

Superior Court of Pennsylvania.

Argued March 22, 1984.

Filed June 14, 1985.

Reargument Denied Aug. 23, 1985.

50

52

Donald J. Martin, Norristown, for appellant.

Samuel A. Litzenberger, Quakertown, for appellee.

Before CAVANAUGH, BECK and TAMILIA, JJ.

TAMILIA, Judge:

This is an appeal from the denial of a mother's petition for expanded shared custody of her two children, Andrea and Darren; the mother is living in a fully acknowledged lesbian relationship. The lower court had before it a petition for involuntary termination of parental rights by the father and stepmother, which it denied. It is not an issue here. There was also a claim for visitation, by the maternal grandparents, determined in their favor; that portion of the judgment has not been appealed. The appeal before the court is solely on the issue of whether the lower court

abused its discretion in entering the partial custody order and refusing to expand the order as suggested by appellant. Among other things, the lower court considered the mother's homosexuality in reaching its decision. Contrary to the view of the appellant, which maintains that the homosexual relationship cannot be considered, we would hold that it is a relevant consideration in any custody determination. If appellant's view was to be adopted, and the issue of homosexuality excluded, the only substantive issue remaining would be that of the best interest of the children, as it related to the mother's parenting capacity.

■ In reaching the issue as to whether or not the mother's petition for expanded partial custody, in effect, shared custody, was properly denied, the trial judge of necessity must have considered whether or not there had been a substantial change of circumstance requiring or permitting a change in the prior Order of Court entered in 1980. The only apparent change of circumstance appearing on the record was the mother's belief that she had now resolved her homosexual identity problems and that since she had now had a stable eight-year relationship with Cathy S., it was now timely to bring it into the open and share it with her children. Appellant would have us find this was a sufficient basis for the court to enter the expanded custody order. We disagree. In a recent holding by this Court, *Agati v. Agati*, 342 Pa.Super. 132, 492 A.2d 427 (1985), we determined that any change in a partial custody order required a showing of changed circumstances and could not proceed initially as an inquiry as to the best interest of the child. As will be developed hereafter, appellant fails by either standard.

■ Our scope of review in matters relating to change of custody has recently been clarified by the Pennsylvania Supreme Court in *Commonwealth v. Robinson*, 505 Pa. 226, 478 A.2d 800 (1984), which states that we are bound by the findings of the trial judge which are reasonably supported by the evidence and all inferences taken therefrom. We do, however, have a broad scope of review, *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635

(1977), and *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980). Within these limitations, the appellate court may set aside the decree or judgment of the trial court only if it finds there has been an abuse of discretion. The appellant would overrule the trial court by setting aside the requirement of proof of changed circumstances and deal with the merits as related to the third and fourth findings of his decree in which the court states:

3. Notwithstanding the efforts of the so called "Gay Rights" movement, we conclude that the natural mother's lesbian relationship shows her moral deficiency; however, there is no proof that the mother's homosexuality constitutes a grave threat to the children.

Therefore,

4. Under such circumstances, we will consider the factor of the natural mother's lesbian relationship only to limit visitation [1] and not to completely deny it.

■ While the trial court made a gratuitous finding concerning the moral nature of the mother's relationship, his decision upon the facts was warranted by the evidence and fully supported by his findings, independent of the one concerning the mother's moral deficiency. The appellant took the moral pronouncement and ran to unwarranted conclusions concerning the court's findings and would have us reverse or alter an otherwise appropriate partial custody order.

A major issue posed is the privacy issue; it requires that we make an inquiry as to whether the law, as it has developed, applies equally to homosexual couples as compared to heterosexuals.[2]

The marital right to privacy is guaranteed by the constitution. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct.

1. See distinction between partial custody and visitation, Actions for Custody, Partial Custody and Visitation, Pa.R.C.P. 1915.1 Scope. Definition.

2. The dissent would deny that this issue was properly raised or should be considered. Since the right to marry is considered a fundamental right by our Supreme Court, the major religions of the world, and the United Nations Charter, and the right to privacy in marriage flows

1678, 14 L.Ed.2d 510 (1965); *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). The personal intimacies of marriage, the home, procreation, motherhood, childbearing, and the family have been held "fundamental" by the Supreme Court and, hence, have been encompassed within the protected rights of privacy. *Marital* intimacies in the privacy of their bedroom are within the protected right of privacy, guaranteed by the right to privacy. *Lovisi v. Slayton,* 539 F.2d 349 (4th Cir., En Banc, 1976), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976). This is not a protected right when others are admitted to observe or participate in their intimacies. Thus, although an activity (sodomy) is a crime, (Va.Code Anno. § 18.1–212, Crimes against nature (anal/oral intercourse between two persons or an animal)), it is protected by virtue of the privacy requirements of marriage. *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) is inapposite because the same privacy right does not apply to unmarried couples engaged in criminal activity. *Doe v. Commonwealth's Attorney for City of Richmond,* 403 F.Supp. 1199 (E.D.Va.1975), *aff'd,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976) (upholding statute as applied to homosexual acts between two consenting adults in private places) (hereinafter, *Doe v. Richmond* ).[3]

Although the Pennsylvania Supreme Court has ruled that sexual intercourse between consenting adults of the same

from this fundamental right, the degree to which personal intimacies are protected is measured by this right. Since in *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) the Supreme Court held that single persons must be treated equally to married persons pursuant to the equal protection clause, XIV Amendment, under certain circumstances (contraception, *Griswald, supra*) the privacy issue is relevant. It, therefore, becomes necessary to analyze the relationship of Constant A. and Cathy S. to determine if their activities, while the children are in their care, are protected, and if not, whether the children's best interest is thereby endangered.

**3.** The dissent would hold *Doe v. Richmond* has no precedental value. Its effect, however, is to sustain the right of authorities in Virginia to prosecute consenting homosexuals apprehended engaging in sexual acts.

sex is not punishable (even when done in public), *Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47 (1980), that ruling turned on the provision in the Pennsylvania Crimes Code, 18 Pa.C.S.A. § 3124, prohibiting consensual deviate sexual intercourse. Section 3101, Definitions, defines "deviate sexual intercourse" as "Sexual intercourse per os or per anus between human beings *who are not husband and wife*, and any form of sexual intercourse with an animal." (emphasis added) For purposes of the Crimes Code chapter on sexual offenses, § 3103, Spouse relationships, extends the interpretation of spouse to include persons living as man and wife, regardless of the legal status of their relationship. The Supreme Court, in a plurality decision with three justices dissenting, and three justices concurring with, but not joining Justice Flaherty, held that the equal protection clause would not permit a statute to impose a penalty on single or nonspousal partners, when it excepts spousal partners from the penalty for identical activity. The extended discussion on morality and freedom by the majority received no concurrence by the other members of the court.

The United States Supreme Court, in *Doe v. Richmond, supra*, found no problem in prohibiting homosexual activity between consenting adults. Indeed, the case which gave the impetus to increased rights in and out of marriage, *Griswold, supra*, in the Concurring Opinion of Justice Goldberg joined by the Chief Justice and Justice Brennan, stated:

> Finally, it should be said of the Court's holding today, that it in *no way interferes with a State's proper regulation of sexual promiscuity or misconduct.* As my Brother Harlan so well stated in his dissenting opinion in *Poe v. Ullman, supra*, 367 U.S. at 553, 81 S.Ct. at 1782.

> *'Adultery, homosexuality and the like are sexual intimacies which the state forbids ... but the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, an institution which the State not only must allow, but*

*which always and in every age it has fostered and protected.'*

This discussion impinges on two aspects of the appellant's argument: first, that the trial court was in error in its consideration of the conduct of appellant and her live-in companion as morally deviant behavior; secondly, it affects the freedom which the appellant has requested, that is, to have unrestricted access to the children in her home and to travel to any state or Canada.

As to the first, without agreeing with the trial judge in his finding on morality, we would acknowledge there is considerable opinion, belief and law in this country, which cannot be ignored, and which supports such a conclusion. Indeed, in most of the cases cited by the appellant and referred to below, regarding *heterosexual* meretricious relations, the court stated that the state does not condone such behavior. Homosexual relations cannot be considered to have a higher standing. Even if not criminalized, the only basis for not condoning the behavior is the moral basis. Secondly, permitting the appellant the freedom to travel could clearly place the children in a situation with the mother and Cathy S., where the adults could be subject to arrest and prosecution for deviant sexual behavior. *Doe v. Richmond, supra.* Thus, if the courts will not provide homosexual behavior the same protection under the privacy considerations of the constitution pursuant to the incorporation doctrine of the fourteenth amendment equal protection provision, and such relationships, even when regularized, are not accorded the attributes of a marriage, infra, it can correctly be described as morally deviant or immoral.

While, unquestionably, the courts of this nation are viewing the emergent issue of homosexuality with much closer scrutiny, understanding and consideration, the national bias, which cannot be ignored is to favor the non-homosexual parent in a custody case. We would prefer to have the trial judge *express* his belief as to the morality of this issue, than to conceal it and to have it be an unverbalized consideration.

■ The appellant would have this Court make a bold policy statement that a parents' homosexuality is not a relevant consideration in awarding custody unless it can be shown that the parents' homosexual behavior adversely affects the children in question. In doing so, she would have us find that the trial court erred in considering the lesbian relationship with Cathy S. in deciding to limit partial custody. This argument makes an erroneous logical conclusion that homosexuality equals homosexual behavior which equals a lesbian relationship, ergo, if homosexuality is not relevant, lesbian relationship is not relevant. We strongly disagree.[4]

■ To make such a finding, the law of Pennsylvania would go far beyond most, if not all, other states in declaring that a lesbian relationship is presumed to be regular, or to state it another way, the presumption of regularity that applies to a heterosexual family (spousal or nonspousal) relationship applies equally to a homosexual relationship. The effect of this is apparent in this case—the burden of proof shifts to the parent alleging the traditional relationship to prove any adverse effect that might arise from the homosexual union. The appellant and the dissent would then rely on this "nexus theory" to either grant or deny visitation or custody according to the proof tendered. We submit the law is and should be that, where there is a custody dispute between members of a traditional family environment and one of homosexual composition, *the presumption of regularity applies to the traditional relationship* and the burden of proving no adverse effect of the homosexual relationship falls on the person advocating it.[5]

4. The dissent would adopt this view and place the burden on the appellee to prove that by granting extended partial custody, the homosexual relationship would adversely affect the children.

5. The dissent would hold that *Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977) would limit the application of presumptions in custody cases. We would agree but believe *Spriggs* has application in those cases where the fitness or capacity of the parents is equal, not as here, where the standing is not equal because of the existence of a meritricious or homosexual relationship. See discussion, *supra.*

■ In addition to the reasons flowing from the discussion on criminal law above, there are other considerations. Homosexual marriages are not permitted and the relationship is not to be equated with heterosexual relations, notwithstanding the Equal Rights Amendment (Pa.1972); *Singer v. Hara*, 11 Wash.App. 247, 522 P.2d 1187 (1974).[6] The Washington Court of Appeals stated,

> In the instant case, it is apparent that the state's refusal to grant a license allowing the appellants to marry one another is not based upon appellants' status as males, but rather it is based upon the state's recognition that our society as a whole views marriage as the appropriate and desirable form for procreation and the rearing of children....

*Singer, id.* at 259, 552 P.2d 1187. The fact remains that marriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race. Similarly, in *DeSanto v. Barnsley*, 328 Pa.Super. 181, 476 A.2d 952 (1984) (Spaeth, P.J.), this Court held, first, that common law marriages and formalized marriages are equivalent forms in Pennsylvania; 2) com-

---

**6.** The dissent would equate all forms of living arrangements as variations in life style. Many variations of style can be accommodated within the concept of marriage and the family but style should and cannot be confused with substance. The essence of marriage is the coming together of a man and woman for the purpose of procreation and the rearing of children, thus creating what we know to be the traditional family. A goal of society, government and law is to protect and foster this basic unit of society. It therefore is entitled to a presumption in its favor over any other form of lifestyle, whether it be polygamy, communal living, homosexual relationships, celebate utopian communities or a myriad of other forms tried throughout the ages, none of which succeeded in supplanting the traditional family. The test of equality between the traditional family and the homosexual relationship cannot be met by the homosexual relationship. Simply put, if the traditional family relationship (lifestyle) was banned, human society would disappear in little more than one generation, whereas if the homosexual lifestyle were banned, there would be no perceivable harm to society. It is clearly evident that the concept of family is essential to society, homosexual relationships are not. A primary function of government and law is to preserve and perpetuate society, in this instance, the family. It, therefore, is required to protect and support the family, which means it must be given every reasonable presumption in its favor.

mon law marriages could not be expanded beyond the ambit of ceremonial marriages without statutory (legislative) enactment, and 3) it is impossible under either form for persons of the same sex to marry. The above case, *Singer,* and the authority cited in those Opinions, deal extensively with the rule of social acceptance, common law, and traditional values, in establishing the definition of marriage. Inherent in that definition is the union of a man and woman for the purpose of procreation and rearing of children. From this is derived the concept of family and the baseline of support and custodial obligations. Our laws that deal with children recognize this precept. (The Juvenile Act, 42 Pa.C.S.A. § 6301 et seq., the Child Protective Services Law, 11 P.S. § 2201 et seq., the Adoption Act, 23 Pa.C.S.A. § 2100 et seq.). When there is intervention and the need to establish rights and limitations, the rights of each parent are protected; Control and Custody of Children, 48 P.S. §§ 91, 92; Custody and Grandparents Visitation Act, 23 P.S. § 1001 et seq. Nowhere is there any hint that the relationship sanctified by tradition and law, the traditional family, is to be considered on an equal basis with a relationship which has received minimal social acceptance and no legal recognition. In *Adams v. Howerton,* 673 F.2d 1036 (9th Cir.1982) (Court of Appeals affirmed federal district court's holding that marriage between persons of same sex did not qualify one of the parties, who was an alien as citizen's spouse pursuant to Immigration and Nationality Act), the court stated:

> In effect, Congress has determined that preferential status is not warranted for the spouses of homosexual marriages. Perhaps this is because homosexual marriages never produce offspring, because they are not recognized in most, if any states, or because they violate traditional and often prevailing societal morals.

*Id.* at 1042. The appellant and dissent would have us take a giant step beyond that taken in *Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976) and *Brooks v. Brooks,* 319 Pa.Super. 268, 466 A.2d 152 (1983) (the mere fact that a parent

has a nonmarital (heterosexual) relationship is insufficient to deny him or her custody of the children), and hold not only that this applies also to homosexual relationships—but more that homosexuality is not a relevant consideration. Even in extramarital heterosexual relationships this Court has held that a parent's meretricious relationship is a factor. An inquiry into the relationship and its effects on the children is necessary to make a proper custody determination. *Rupp v. Rupp*, 268 Pa.Super. 467, 408 A.2d 883 (1979); *McCann v. McCann*, 270 Pa.Super. 171, 411 A.2d 234 (1979). The reason for extending the rule in relatively recent times to accord some meretricious heterosexual relationships the status accorded to marriage, is that in most respects other than the ceremonial, they comply with the traditional requirements of a family, a man and woman who live together in a stable family relationship, who have or may procreate, providing the substance needed to rear children—"one that might be considered a durable de facto relationship", *Stauton v. Austin*, 209 Pa.Super. 187, 194, 223 A.2d 892 (1966). The realities of modern society with the dramatic increase in separation and divorce, the enormous increase in unmarried couples and the very substantial number of families affected thereby, required the recognition by legislatures and the courts of the extension of the family concept. Particularly in Pennsylvania, until the Divorce Act of 1980 (23 P.S. § 101 et seq.) because of the difficulty in obtaining divorce, and the termination of support upon divorce, it was not uncommon to find many parties living in long term meretricious, but otherwise suitable family situations. In some respects, it harbors back to an earlier age in the evolution of the family when formal unions were much less prevalent. In virtually all respects, these meet the test of the relationship connoted by marriage. The same cannot be said for the lesbian relationship, whether it be analyzed from the traditional, legal or social point of view. Thus to equate it on the same level as the traditional family, by presuming equality with such a family, is a fallacy. This is in no way a refutation of the doctrine of *Spriggs v. Carson*, *supra*, which eliminated any

presumptions in favor of one parent as to the other and provided that the evidentiary scale is evenly balanced at the outset. Here, the father and mother started equal; once the father established the mother's lesbian relationship and his own legitimate and stable heterosexual family relationship, a presumption arose favoring the preferability of the traditional relationship. *In Re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977).

Thus in the context of this case, it was incumbent upon appellant to prove that there would be no adverse effect to an enhanced partial custody order, that would have included total exposure to the mother's life style. In addition, as stated above, since there was already a partial custody order dated May 1, 1980, the appellant was required to show a change of circumstances, permitting the Order to be modified, and that it was in the best interest of the children to do so. The appellant failed to prove this in all respects.

Contrary to the glowing and faultless description of the facts favorable to the appellant presented in her brief and adopted by the dissent,[7] we find, after a careful review of the record, the briefs of the parties, including the Amicus Brief of the Civil Liberties Union, and the Opinion of the trial court, that the lower court, in its findings, was basically correct and that his decree must be sustained. *Commonwealth v. Robinson, supra.*

There are substantial reasons for sustaining the trial court. Three are paramount.

1) In any custody case in which a child is to spend substantial time in the company of an adult in the custodial setting, it is incumbent on the parties and the court to present for appellate review the testimony of that person. Here, one half of the mother's relationship to which the children were to be exposed did not appear on the record except by reference. Neither the trial court nor we are able to apprise her character, appearance, demeanor or by the major analytical tool at trial, cross-examination, probe her

7. See Dissenting Opinion, p. 68.

feelings, desires, intent, capacity or potential to be a supervising surrogate or custodial influence. We know fully what the character and capacity of the father and stepmother are for parenting, but we know only that half of the relationship with Cathy S., represented by the mother. Under some standards, moral lapse of nonmarital relationships occurring in the past may be forgiven, but conduct which is persistent and flagrant will not be excused by the courts. *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973); *In re Snellgrose,* 432 Pa. 158, 247 A.2d 596 (1968). In this case, the least the courts should require is the careful appraisal of the person, Cathy S., if it is to determine, in the best interest of the children, whether or not there was a material detriment. *Rupp, Myers, supra.* The behavior of all persons who will either reside in the proposed home or will exert a substantial influence over the child falls within the purview of the court. *Commonwealth ex rel. Bordlemay v. Bordlemay,* 201 Pa.Super. 435, 193 A.2d 845 (1963); *also see Dile v. Dile,* 284 Pa.Super. 459, 426 A.2d 137 (1981). If upon remarriage, testimony by and about the newly acquired spouse is virtually indispensible, *J.F.G. v. K.A.G.,* 278 Pa. Super. 25, 419 A.2d 1337 (1980); *Summers v. Summers,* 273 Pa.Super. 285, 417 A.2d 651 (1979), how much more critical is the testimony of a partner to a nonmarital lesbian relationship.

2) In all of the leading cases expanding the rights of heterosexual relationships cited above, the children were involved in the family and knew of the relationship. In one case, *Commonwealth ex rel. Drum v. Drum,* 263 Pa.Super. 248, 397 A.2d 1192 (1979), the Court (as here) limited visitation outside the scope of the relationship because the mother believed the moral values of the children would be affected. Here, the children do not know of the lesbian relationship of their mother, and it is inconceivable that they would go into that environment, be exposed to the relationship, and *not* suffer some emotional disturbance, perhaps severe. The mother recognized this by suggesting

counselling, likely to be done by a homosexually-oriented counselling service. This presents a situation totally unlike any of the cases referred to above or cited by the appellant or dissent as authority for treating this case as equivalent to *Myers* and *Austin, supra.* At ten and thirteen, Darren and Andrea are probably more vulnerable to what may be perceived as radical alterations in their view of a parent and parental relationships, and to being compelled to adjust to a lifestyle to which they had no prior exposure, than at any other period of their lives. Rightfully or wrongly, the father and mother have sheltered the children from this knowledge, and by doing so, insinuated that the mother's behavior is unacceptable. To reverse this will require the children to accept their mother's role, and to some extent, to proselytize the children by indicating that because of the role model now found acceptable, it is a suitable life style for the children, particularly Andrea.[8] Whether or not earlier exposure would have been less harmful is a rhetorical consideration as there are different problems at different stages of the developmental process. If the mother took several years to deal with her own sexual orientation, requiring separation and distancing from family and psychiatric counselling, how can we expect the children to grasp the complexities of the mother's relationship forthwith, as would result from the appellant's suggested expanded order. This is not an issue of lifestyles; it is one of the effect of the relationship on the children. *See Drum, Rupp, Snellgrose, supra.*

■ 3) The third important factor, considered by the court below and evident from the record, based on testimony and en camera interviews with the children, is that the children do not wish to spend additional time with their mother.[9] While there is testimony indicating the mother

8. The testimony of the psychiatrist and the studies she cited are unpersuasive as they are of limited number and of recent origin and have not withstood the test of time.

9. The dissent would discount the feelings of the children, although well reasoned, and the findings of the trial judge, who is in the best position to determine the depth and reasonableness of this considera-

showed limited maternal interest, concern and capacity, and some showing otherwise, the children clearly expressed their belief that time spent with the mother was wasted, boring and·not qualitatively on a par with that of their custodial family. Their desire to limit further contact was clearly related to being in a more vital and satisfying environment, which they did not want interrupted. The evidence clearly supported the conclusion that the father and stepmother provided far superior parental involvement and interaction than the mother and thus support the intelligent and logical reasons given by the children for their choice. The Courts have held that the preference of the children, although not controlling, is a factor to be carefully considered, so long as it is based on good reasons. *McCourt v. Myers*, 258 Pa.Super. 152, 407 A.2d 875 (1979); *Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1978). Nothing on the record indicated an improvement in maternal parenting from the time of the previous order, or for that matter, since the time the mother left eight years earlier.

 Finally, while it is improper to deny partial custody consideration because of a moral lapse that occurred sometime in the past and to refuse to acknowledge rehabilitation by the parent, *Commonwealth ex rel. Holschuh v. Holland-Moritz*, 448 Pa. 437, 292 A.2d 380 (1972), it cannot be ignored as the past is prologue to the future and the present is the dividing point between the two. Unquestionably, the mother abandoned her family to assume a lifestyle which she was aware had little or no legal, social or moral acceptance. The issue is not whether she had a right to do this or whether it was moral or immoral; it must be weighed purely as it affected the children. The paramount consideration is the welfare of the children and all considerations, including the rights of parents, are subordinate to the children's physical, intellectual, moral, spiritual and emotional well being. *Commonwealth ex rel. Stauton v.*

tion. We can find no reason, supported by law or fact, which would permit us to ignore it.

*Austin,* 209 Pa.Super 187, 223 A.2d 892 (1966) *allocatur denied.* The *Austin* court acknowledged that such a relationship (illicit heterosexual) is not to be condoned in our society. Unquestionably, the same can be said for a lesbian relationship. To permit the stability of the children and the hard won growth as a family experienced by them and their custodial parents, to be sacrificed to the desires of a mother who wishes a closer relationship with them, which they reject, after being virtually abandoned by her—when that relationship is loaded with unconventional and traumatic aspects, is unconscionable.

While we would hold that as in *Bezio v. Patenaude,* 381 Mass. 563, 410 N.E.2d 1207 (1980), homosexuality per se is not a basis for denying visitation or partial custody to a parent, we do not consider it irrelevant. In this regard the lower court held, correctly, that such a relationship was not so severely disabling to the physical or moral health of the children to terminate parental rights or deny visitation. *Commonwealth ex rel. Sorace v. Sorace,* 236 Pa.Super. 42, 344 A.2d 553 (1975); *Lewis v. Lewis,* 271 Pa.Super. 519, 414 A.2d 375 (1979). However, as we discussed above, there are sufficient distinctions between legal relationships and meretricious relationships to find that it is a relevant consideration in every custody case to scrutinize the illicit relationship, whether heterosexual or homosexual.

We also find, as discussed above, that there are sufficient social, moral and legal distinctions between the traditional heterosexual family relationship and illicit homosexual relationship to raise the presumption of regularity in favor of the licit, when established, shifting to the illicit, the burden of disproving detriment to the children. In doing so, we recognize the need to examine carefully each case, to determine the detriment or possible detriment to the children of a homosexual parent, but would not adopt the policy espoused by the appellant, cited by *Patenaude, supra; D.H. v. S.H.,* —— Ind.App. ——, 418 N.E.2d 286 (1981) where no consideration is to be given to the sexual preference unless concrete harm to the child is proven. A review of

the cases throughout the country indicates no uniformity in this respect, and there is a multiplicity of holdings in every direction. Since each of those cases are distinguishable on their facts and according to local statutory interpretation, they offer little in the way of guidance. While the appellant cites cases favorable to ignoring the lesbian relationship, other equally authoritative citations are available.

In *Irish v. Irish*, 7 F.L.R. 2256, the Michigan Court of Appeals held that the court could condition Orders of visitation so that the mother could not have contact overnight with her lesbian partners while the children visited. In *Woodruff v. Woodruff*, 6 F.L.R. 2250, the North Carolina Court of Appeals allowed father visitation, but specified his child could not be in the presence of the father's male lovers nor was he to have any friends visit him at home while the child was there; *In re J.S. & C.*, 129 N.J.Super. 486, 324 A.2d 90 (1974) permitted visitation but denied unrestricted visits or any overnight stays with the homosexual partners or exposure to any homosexual activity; *S. v. S.*, Ky.App. Cf., 7 F.L.R. 2133 (1980) held that while it would refuse to conclude as a matter of law that lesbianism is sufficient to justify a change of custody, the court went on to hold that the lesbianism of the mother was a sufficient change of circumstance to review the effect on the child as "potential for endangering" the child's welfare. It quoted the Journal of the National Association of Social Workers, Vol. 25, Number 3, May, 1980, pp. 198 et seq., "The lesbianism of the mother, because of the failure of the community to accept and support such conditions, forces on the child a need for secrecy and the isolation imposed by such a secret, thus separating the child from his or her peers."

We believe and find here that there was no change of circumstance sufficient to warrant a revocation of the order of May 1, 1980, and that upon all of the evidence, appellant failed to prove on the record, that the children would not suffer detriment, and to the contrary, from the evidence and all reasonable inferences therefrom, it is clearly established they would suffer severe detriment by the

order suggested by the appellant. The controlled partial custody and visitation order proposed by the trial court will assure a minimum of harm to the children, while permitting the mother and children to have reasonable contact with each other. (*See In re J.S. & C., supra.*)

Judgment affirmed.

BECK, J., dissents.

BECK, Judge, dissenting:

I respectfully dissent. In the context of partial custody, I would hold that a parent's homosexuality is a relevant consideration *if* it can be shown that the parent's homosexual behavior adversely affects the child(ren) in question.

It is important to recognize that the question before the court is limited to expanded partial custody. The majority does not recognize this limitation and writes without distinguishing standards for shared custody, sole custody and partial custody. At 52–54. The mother-appellant in the case sub judice is not requesting shared custody, sole custody or unrestricted access (At 58) but delimited partial custody.

Also, it is important to note that the issue of privacy has been raised sua sponte by the majority. At 54–58. Said issue was neither briefed nor argued by the parties, and accordingly, this court is precluded from deciding the issue. *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975).[1] The majority relies on *Doe v. Commonwealth's Attorney for Richmond,* 403 F.Supp. 1199 (E.D.Va.1975), *aff'd,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976). The majority states, "The United States Supreme Court, in *Doe v. Richmond, supra,* found no problem in prohibiting homosexual activity between consenting adults." At 56. This is not a

1. Furthermore, the Pennsylvania Supreme Court has repeatedly stated that a court of this Commonwealth "should not reach [a] constitutional issue if [a] case can properly be decided on non-constitutional grounds." *Ballou v. State Ethics Commission,* 496 Pa. 127, 129, 436 A.2d 186, 187 (1981) (footnote deleted), *reargument denied,* December 1, 1981.

correct statement. It is significant that the United States Supreme Court did not issue an opinion in *Doe v. Richmond.* Rather, the Supreme Court affirmed a divided three-judge Virginia district court which declined to grant declaratory or injunctive relief to bar enforcement, or threatened enforcement, of the state's sodomy statute against male homosexuals.

The Supreme Court's summary affirmance of the Virginia district court's ruling has limited precedential value, *Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974), and has been criticized as "an egregious example of an unexplained summary affirmance." P. Bator, D. Shapiro, P. Mishkin & H. Wechsler, Hart and Weschler's The Federal Courts and the Federal System 112 n. 1 (Supp.1977); *see also* L. Tribe, American Constitutional Law 943 (1978). Thus, the majority's foundation for the broad privacy concepts it asserts is weak. I explain this not from a reverence for technical purity but to indicate that the majority's discussion on privacy cannot serve as the basis for future decisions on the subject in this Commonwealth.

The scope of appellate review in partial custody matters is analogous to that in custody matters. The appellate court is bound by the trial court's factual findings if supported by competent evidence of record. *Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800 (1984). The scope of appellate review is otherwise broad. *Id.; Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977); *In re Donna W.,* 325 Pa.Super. 39, 472 A.2d 635 (1984).

In denying expanded partial custody, the trial court stated:

3. Notwithstanding the efforts of the so called "Gay Rights" movement, we conclude that the natural mother's lesbian relationship shows her moral deficiency; however, there is no proof that the mother's homosexuality constitutes a grave threat to the children.

4. Under such circumstances, we will consider the factor of the natural mother's lesbian relationship only to limit visitation [2] and not to completely deny it.

Its reasoning was further explained in the Decree Nisi:

(b) The limited visitation provided herein is sufficient to maintain the natural mother's identity with the children. Any greater periods would be burdensome to the children and unduly interfere with the father and stepmother's primary caretaking responsibilities. Moreover, the children have become so secure and well adjusted in their present home that we fear it will be harmful to award a greater parental role to the natural mother.

The trial judge's thoughtful opinion reflects an appreciation for a stable traditional family. I have no doubt that such a natural family is a more certain base for children's healthy development. But courts can neither create traditional families for children where the truth reveals otherwise nor insulate children from parents who do not fit the traditional mold.[3] It is not desirable for the court to shield children from significant contact with a parent whose lifestyle the court might find unacceptable without a showing that the parent's behavior will adversely affect the children.

For many years homosexual relationships were kept hidden from the view of society. However, they have now become more open, and to some degree more accepted in our culture. Parents living in openly homosexual relationships have begun to use the courts to seek custody and

2. The trial court has substituted the word visitation for partial custody. The meaning of the word visitation as used by the trial court is the same as partial custody. " '[P]artial custody' means the right to take possession of a child away from the custodial person for a certain period of time." Pa.R.C.P. No. 1915.1; *Scott v. Scott*, 240 Pa.Super. 65, 368 A.2d 288 (1970) (Spaeth, J., concurring). Essentially, partial custody is granted "where psychological considerations ... or geographical reasons ... require that the non-custodial parent see the child out of the presence of the custodial parent." *Id.*, 240 Pa.Superior Ct. at 69, 368 A.2d at 291 (Spaeth, J., concurring); *see also Commonwealth ex rel. Zaffarano v. Genaro*, 500 Pa. 256, 455 A.2d 1180 (1983).

3. *See* Beck, *Nontraditional Lifestyles and the Law*, 17 J.Fam.L. 685 (1979).

partial custody. *See, e.g.,* Basile, *Lesbian Mothers I: Custody and Homosexual Parents,* 2 Women's Rights L.R. 3, 1974; Evans, *Parent and Child: M.J.P. v. J.G.P.: An Analysis of the Relevance of Parental Homosexuality in Child Custody Determinations,* 35 Okla.L.R. 633 (1982); Kraft, *Lesbian Child Custody,* 6 Harvard Women's L.J. 183 (1983).

In the context of partial custody I would hold that a parent's homosexuality is a relevant consideration *if* it can be shown that the parent's homosexual behavior adversely affects the child(ren). In order for homosexuality to be relevant there must be a clear factual showing of a connection between the parent's homosexuality and its adverse effect on the well-being of the child(ren).

Judge Louis D. Stefan of Montgomery County outlined a nexus test which I would adopt.

In deciding custody, a judge should consider a parent's sexual preference only where there has been a clear factual showing of a connection between the parent's sexual preference and concrete harm to the child. Requiring a showing of nexus is particularly important where there exists such a great potential for subjective prejudice solely because one parent is a homosexual.

*Commonwealth ex rel. Barron v. Decker,* 107 Montg. 8, 12 (1980), quoting Hitchens, Martin & Morgan, *Child Custody and the Homosexual Parent,* 18 Judges J. 33, 35 (Fall 1979).

I find that the nexus test properly focuses the inquiry on the impact of the parent's lifestyle and behavior on the child. It is inappropriate to focus the inquiry solely on a moral or psychological judgment of the parent's behavior. The latter approach too easily results in the punishment of both the parent and child by depriving them of each other's nurture, love and companionship. Campbell, *Child Custody: When One Parent is Homosexual,* 17 Judges J. 38.

Other jurisdictions have employed the "nexus" test in making custody and partial custody or visitation determinations where one parent is openly homosexual. *See, e.g.,*

*Bezio v. Patenaude,* 381 Mass. 563, 410 N.E.2d 1207 (1980); *Schuster v. Schuster,* 90 Wash. 626, 585 P.2d 130 (1978); *In re J.S. & C.,* 129 N.J.Super. 486, 324 A.2d 90 (Chancery Div.1974), *aff'd,* 142 N.J.Super. 499, 362 A.2d 54 (1976); *D.H. v. S.H.,* Ind.App., 418 N.E.2d 286 (1981), and cases cited in Evans, *supra,* and Hunter and Polikoff, *Custody Rights of Lesbian Mothers: Legal Theory and Litigation Strategy,* 25 Buffalo L.R. 691 (1976).

As the Supreme Judicial Court of Massachusetts stated, "The state may not deprive parents of custody of their children simply because their households fail to meet the ideals approved by the community ... [or] simply because the parents embrace ideologies or pursue lifestyles at odds with the average." *Patenaude,* 310 Mass. at 570, 410 N.E.2d at 1216.

This court is once again faced with the question whether the law shall be tolerant of different lifestyles. Several years ago the courts in Pennsylvania were confronted with a similar dilemma in making custody and partial custody awards: whether to permit greater tolerance of parents' non-marital sexual relationships with persons of the opposite sex. The courts responded responsibly and concluded that such non-marital sexual relationships were relevant only if they could be shown to have an adverse effect on the child(ren). *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *Brooks v. Brooks,* 319 Pa.Super. 268, 466 A.2d 152 (1983).[4] I would now apply the same analysis to non-marital sexual relationships with persons of the same gender.[5]

4. Thus, "[t]he current law reflects the evolution in traditional morality .... Prohibitions have been eased against lifestyles that in prior times were considered unorthodox." Beck, *supra* note 3, at 701.

5. The majority states that where there is a custody dispute between members of a traditional family environment and one of homosexual composition, "the presumption of regularity applies to the traditional relationship." At 64–65. Unlike the majority, I do not premise my analysis upon such a presumption but rather follow the Pennsylvania Supreme Court's caveat in *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 300, 368 A.2d 635, 640 (1977): "Courts should be wary of

In the instant case I would analyze the record to deter-
mine whether a nexus exists between the mother's homo-
sexual lifestyle and harm to the children. I conclude that
no nexus has been established. On the contrary, the record
reveals that the mother's life is stable. She has an endur-
ing relationship with another person, an excellent work
record, and she is a respected member of the community.
The testimony of the mother, her employer, her co-worker
and two lifelong friends support this conclusion. Record at
221–315; 315–330; 413–418; 418–446; 446–459.

Together, the mother and her childhood friend Cathy own
a 10-room, 4-bedroom house which is well decorated and
maintained. The mother had been working at New England
Baptist Hospital for seven years at the time of the hearing,
and had been recently promoted. Her employer was aware
of her homosexuality. She described the mother as, "Very
responsible, very thorough, very well organized. She helps
me get through the day. She is always on time, very well
respected in the hospital." Record at 318. Cathy is a
nurse-anesthetist working at another Boston hospital. Both
the mother and Cathy are well respected and active in
community affairs in their neighborhood.

In the instant case there was no showing that expanded
partial custody would adversely affect the children. The
testimony of the father and his witnesses concerned the
relationship between the children and their mother before
their mother moved to Boston, the stress her move created
for them, and the limited contact she has had with the
children since that time. The father presented no expert or
lay opinion to support a conclusion that the children would

deciding matters as sensitive as questions of custody by the invocation
of 'presumptions'. Instead, ... courts should inquire into the circum-
stances and relationships of all the parties involved and reach a
determination based solely upon the facts of the case then before the
Court." Hence, I consider the particular facts of record in the case
sub judice and base my conclusion upon the evidence adduced by the
parties.

be harmed by spending two weeks with their mother away from their father's home.[6]

The necessary nexus between the mother's lifestyle and harm to the children has not been demonstrated of record. I, therefore, would hold that the trial court erred in denying the mother's petition for expanded partial custody in the absence of any showing that such an arrangement would adversely affect the children.

The trial court found that expanded partial custody would be unduly burdensome and would interfere with the primary caretaking responsibilities of the father and his new wife. The record does not support this determination. The inconvenience of travel and temporary separation of the children from their home is routinely experienced by many families in which parents live apart. Nothing in this record indicates that this family would be unusually or uniquely burdened by it. Similarly, there is no support in the record for the trial court's concern that it would be harmful to award a greater parental role to the mother simply because the children are well adjusted with their father and his new wife. On the contrary, the children's good relationship in their father's home should help the children make easier adjustments with their natural mother in Boston.

Additionally, I note that the recent strain occasioned by visitation seems to be due, in great part, to the reluctance on the part of the father to allow the mother to play a maternal role in the lives of her children. This attitude is evidenced by his petition to terminate her parental rights, the trial court's finding that he had recently created barriers to her visitation (At 57–58), and testimony that he had

6. The mother presented the expert testimony of Dr. Mary Cochran, a developmental psychologist and director of an out-patient mental health clinic which serves many homosexual parents as clients. Dr. Cochran testified that from her experience and from studies done by other experts in the field, she has concluded that there is no adverse impact on children who are raised by homosexual parents. Because her testimony related to full custody by homosexual parents, and because she did not actually interview the parties or their children, however, this evidence is of little relevance to the specific issue on appeal.

told the mother that the children didn't need her anymore. Record at 81.

The children both testified that they did not wish to travel to Boston and would be satisfied if they never saw their mother again. Although the children may be reluctant to leave their familiar home and understandably may have feelings of resentment toward their mother, these sentiments are not controlling in partial custody cases. *Fernald v. Fernald*, 224 Pa.Super. 93, 302 A.2d 470 (1972); *Commonwealth ex rel. Turner v. Strange*, 179 Pa.Super. 83, 115 A.2d 885 (1955). Furthermore, I am not persuaded that the children reached these conclusions independent of the influence of their father and stepmother.

Both the father and the stepmother view the children's monthly weekend visit at their maternal grandparents' home as an inconvenience rather than an opportunity for the children to maintain a relationship with their mother and grandparents. Record at 83–87; 164. The stepmother testified that the children's natural mother would not be welcome in her home. Record at 159. The children are aware of their father's and stepmother's feelings. When asked if he knew what these proceedings were about, Darren answered that his father and stepmother were trying to keep him and Andrea from going to Boston. Record at 141. The father asked both children to sign his petition for the termination of the mother's parental rights, and explained to them what it would mean. Record at 70–71. To limit the mother's contact with her children because their father has made it unpleasant and difficult would be unfair to both the mother and the children. *See Commonwealth ex rel. Ermel v. Ermel*, 259 Pa.Super. 219, 393 A.2d 796 (1978).

A careful review of the record supports granting expanded partial custody. It clearly traces the mother's enduring concern for her children. The trial court noted the mother's decision to leave Pennsylvania caused her great distress. She did not lightly make the decision to leave her traditional lifestyle which was approved by her family and friends in

favor of a homosexual lifestyle which was unacceptable in her community. At 4. She realized it would create some initial stress for the children and their father.

The mother left Pennsylvania after explaining to the father that she was homosexual and that it would be best for the children if they remained with him in familiar surroundings supported by friends and family. The trial court noted that the mother did not abandon her children, but "quite to the contrary, she entered into a written agreement under which the primary caretaking responsibilities were assumed by the father, but reserving visitation rights for herself." At 3.

The trial court found that with a few exceptions, the mother saw the children on a regular basis from the fall of 1975 until April 1979, and that recent lack of contact "resulted from barriers created by the father." At 4–5. I would not draw a negative inference from the fact that the mother turned the children over to their father, "[r]ather, [I would] construe same as the action of a concerned and loving mother interested in promoting the best interest of her child[ren] at that juncture." *In re Wesley J.K.*, 299 Pa.Super. 504, 508, 445 A.2d 1243, 1245 (1983) (footnote deleted).

In support of expanded partial custody, the mother testified that she wants Andrea and Darren to visit her in Boston so that they can develop a fuller relationship. She delayed this request until she felt they were old enough to travel, and she was able financially to provide transportation for them. She plans to take them to the hospital where she works, to Cape Code, the Aquarium, the Museum of Science, and other attractions in the Boston area. Each child would have his or her own bedroom while visiting the mother. She has not told them that she is a homosexual, and does not know if anyone else has done so. She would seek professional guidance regarding the best way to approach this issue with them.

The analysis I advocate supports Pennsylvania's long and deeply held conviction regarding the importance of partial custody and visitation. Partial custody has been granted in

this Commonwealth even when the non-custodial parent has had little contact with the child for long periods of time, *Fernald; Strange; Commonwealth ex rel. Boschert v. Cook,* 122 Pa.Super. 397, 186 A. 229 (1936), and where the children do not wish to visit the non-custodial parent. *Pamela J.K. v. Roger D.J.,* 277 Pa.Super. 579, 419 A.2d 1301 (1980); *Fernald.*

This court has required the custodial parent to prepare a child for such visits by urging the use of parental authority to compel a reluctant child to visit with the other parent. *Fernald; Commonwealth ex rel. Lotz v. Lotz,* 188 Pa.Super. 241, 146 A.2d 362 (1958); *Strange.*

Partial custody is routinely granted even when the child must travel long distances from the custodial home. *See, e.g., Pamela J.K.; Commonwealth ex rel. Shoemaker v. Shoemaker,* 211 Pa.Super. 188, 235 A.2d 455 (1967); *Commonwealth ex rel. Skurat v. Gearhart,* 178 Pa.Super. 245, 115 A.2d 395 (1955).

The court's clear and strong line of cases supporting partial custody is founded on public policy encouraging continued contact and relationship between natural parent and child. *Pamela J.K.; Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879 (1977). "Every parent has the right to develop a good relationship with the child, and every child has the right to develop a good relationship with both parents." *Pamela J.K.,* 277 Pa.Super. at 593, 419 A.2d at 1309.

> Visitation rights of a parent not in custody have long been a matter of concern to the law of this Commonwealth. They must be carefully guarded for when parents are separated and custody is placed in one of the parents, there exists a danger that the parent having custody of the child may use his or her advantageous position to alienate the other parent from the affections of the child.

*Lotz,* 188 Pa.Super. at 246, 146 A.2d at 364.

In conclusion, I would reverse the order of the lower court insofar as it denied expanded partial custody, and in

all other respects, I would affirm the order of the trial court, *i.e.*, its provision for monthly weekend partial custody for the natural mother, and its separate provision for partial custody for the maternal grandparents.