453 A.2d 1020

**William Joseph SMITH, Appellant**

v.

**Sherry Ann SMITH.**

Superior Court of Pennsylvania.

Argued Sept. 14, 1982.

Filed Dec. 10, 1982.

Philip Samuel Cosentino, Chambersburg, for appellant.

John F. Nelson, III, Chambersburg, submitted a brief on behalf of appellee.

Before CAVANAUGH, BECK and MONTEMURO, JJ.

BECK, Judge:

Appellant-father, William Joseph Smith, and appellee-mother, Sherry Ann Smith, were married on June 13, 1977 and their daughter, Jesse Michelle Smith, was born on March 9, 1979. This is an appeal from an October 14, 1981 order granting appellee primary custody of Jesse.

■ The procedural history leading up to that order was as follows. On August 21, 1980, appellant filed a Petition to Confirm Custody to which appellee filed an Answer on September 5, 1980. On September 18, 1980, the parties met with Richard Mason, the Franklin County Child Mediation Officer, and on October 7, 1980, Mason filed a report recommending the imposition of a shared custody arrangement. On October 10, 1980, in response to Judge John W. Keller's request, Mason suggested a plan for implementation of a viable shared custody arrangement. On April 13, 1981 there was a stipulation by the parties arranging for shared custody; that stipulation was reduced to a court order[1] imposing shared custody which read as follows:

1. Respondent [appellee] shall have custody of Jesse Michelle Smith each Monday from 8:00 a.m. until Wednesday at 11:30 a.m.; each Wednesday from 7:30 p.m. until Thursday at 3:00 p.m.; each Friday from 8:00 a.m. until 3:00 p.m.

2. The Petitioner [appellant] shall have custody of Jesse Michelle Smith each Wednesday from 11:30 a.m. until 7:30 p.m.; each Thursday from 3:00 p.m. until Friday at 8:00 a.m.; and each Friday from 3:00 p.m. until Monday at 8:00 a.m.

3. Each party shall have uninterrupted custody during his/her vacation provided that he/she has given the other

1. As we noted in *Daniel K.D. v. Jan M.H.,* 301 Pa.Super. 36, 39 n. 1, 446 A.2d 1323, 1324 n. 1 (1982), the stipulation which was reduced to a court order binds the parties just as any other custody order:

   Although an agreement between parties as to custody is not binding upon the court, *Commonwealth ex rel. Veihdeffer v. Veihdeffer,* 235 Pa.Super.Ct. 447, 344 A.2d 613 (1975), where the parties' agreement is incorporated into a court order, the order binds the parties and governs further court action in the same manner as any other custody order issued by a court. *Commonwealth ex rel. Ackerman v. Ackerman,* 34 D. & C.2d 111 (1964), *aff'd,* 204 Pa.Super.Ct. 403, 205 A.2d 49 (1964), *allocatur refused,* Feb. 15, 1965 (involved unilaterally requested modification of the parties' prior stipulation which had been approved by the court); *Commonwealth ex rel. Hickey v. Hickey,* 216 Pa.Super.Ct. 332, 264 A.2d 420 (1970), *allocatur refused,* May 25, 1970; Pa.R.C.P. 1915.7 and Pa.R.C.P. 1915.9 and the attendant explanatory comments of the Civil Procedural Rules Committee [.]

party at least two weeks advance notice as to the time of said vacation.

4. Each party shall be entitled to additional custody at such times as can be mutually agreed upon.

On July 2, 1981, appellant, seeking primary custody, filed a Petition to Modify the Custody Order, and on August 14, 1981, appellee filed her Answer. A September 11, 1981 hearing followed after which Judge George E. Hoffer entered an order granting appellee primary custody.

Our Court enunciated clearly in *Robert H.H. v. May L.H.,* 293 Pa.Super. 431, 433–434, 439 A.2d 187, 188–189, *as amended,* (Feb. 26, 1982) (footnote omitted) our broad scope or review in child custody matters:

> Our scope of review in custody disputes is very broad. *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977); *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976). We will review the record very closely not with a mind toward usurping the fact-finding function of the trial court, but with a responsible eye searching to ferret out what is in the "best interest of the children." *In re Custody of White,* 270 Pa.Super. 165, 411 A.2d 231 (1979). Accordingly, we are not bound by the deductions and inferences made by the judge who heard the dispute. *Trefsgar v. Trefsgar,* 261 Pa.Super. 1, 395 A.2d 273 (1978); *Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa.Super. 144, 331 A.2d 665 (1974). Thus, we make an independent review of the evidence and render an independent judgment which will assure that the Commonwealth's justifiable concern for the health and safety of its children is met. *Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879 (1977) .... We shall approach this review with an open mind and will not adhere to an abuse of discretion standard. Simply stated, our broad scope of review encompasses but is not limited to the narrow scope of review described by the term abuse of discretion. *Commonwealth ex rel. Berman v. Berman,* 289 Pa.Super. 91, 432 A.2d 1066 (1981). To reason in any other manner contradicts the very essence of our standard of review in

custody cases. *In re Jennifer Lynn Arnold, Appeal of Merrill S. Arnold,* 286 Pa.Super. 171, 176, 428 A.2d 627, 629 (1981) (HOFFMAN, J., Concurring Opinion); *Commonwealth ex rel. E.H.T. v. R.E.T.,* 285 Pa.Super. 444, 458, 427 A.2d 1370, 1376 (1981) (HOFFMAN, J., Concurring Opinion).

■ The lower court judge modified the shared custody arrangement and ordered sole custody to appellee because he found a substantial change of circumstances warranting the modification [2]:

The first question we must address is whether the circumstances have sufficiently altered to permit the prior decree to be modified. The prior decree granted joint custody [3] with possession of the child alternating nearly daily between the parties. The father established at the hearing that he has enrolled in Kutztown State College and shortly will be moving to the Allentown area, a distance of approximately 120 miles from Chambersburg. Clearly, in light of the parties' work and school schedules and the distance between the parties' homes, joint custody under the prior April 13, 1981, decree is not feasible.

Lower court opinion at 7–8.

We disagree with that finding and conclude that a shared custody arrangement is in Jesse's best interests.[4] While we

2. We find the lower court was correct in finding that there had been a substantial change in circumstances that would justify the modification of the prior order. *See Daniel K.D.* As this Court noted in *In re Custody of Phillips,* 260 Pa.Super. 402, 394 A.2d 989 (1978), relocation of one of the parents may constitute the predicate for a court ordered modification. In the instant case, "possession of the child alternat[ed] nearly daily between the parties." Lower court opinion at 7. It is quite clear that the move would make compliance with the prior order virtually impossible.

3. Shared custody is referred to as joint custody by some of the authorities quoted herein. The two terms are synonymous and interchangeable.

4. As we noted in *In re Wesley, J.K.,* 299 Pa.Super. 504, 508 n. 3, 445 A.2d 1243, 1245 n. 3 (1982) (quoting *In re Arnold,* 286 Pa.Super. 171, 174, 428 A.2d 627, 628 (1981):

do not dispute the need to change the shared custody order of April 13th to reflect the exigencies of the 120 mile distance between the current homes of appellant and appellee, we do not feel this should preclude a shared custody arrangement.

It is clear, as we noted in *In re Wesley J.K.*, 299 Pa.Super. 504, 514, 445 A.2d 1243, 1248 (1982), that Pennsylvania courts possess authority to award shared custody, although there is no presumption favoring that award:

In deciding whether courts of this Commonwealth have authority to decree shared custody arrangements, attention to a recent legislative enactment is helpful:

The General Assembly declares that it is the public policy of this Commonwealth, when in the best interest of the child or children, to assure a reasonable and continuing contact of such child or children with both parents after a separation or dissolution of marriage, and the sharing of the rights and responsibilities of child rearing by both parents.

Section 2 of the Custody and Grandparents Visitation Act ("Act"), Act of November 5, 1981, Act 1981–115, 23 P.S. § 1002.[5]

It is axiomatic that the polestar of any custody proceeding is the best interests of the child, a term which encompasses her spiritual, physical, emotional and intellectual well being. *In re Custody of White*, 270 Pa.Super. 165, 411 A.2d 231 (1979); *In re Custody of Neal*, 260 Pa.Super. 151, 393 A.2d 1057 (1978); *Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1978); *Commonwealth ex rel. Scott v. Martin*, 252 Pa.Super. 178, 381 A.2d 173 (1977); *Commonwealth ex rel. Cutler v. Cutler*, 246 Pa.Super. 82, 369 A.2d 821 (1977).

5. While the order from which this appeal was taken was entered prior to the effective date of the foregoing Act, section 11 of that Act allows us to modify that order:

Any order for the custody of the child or children of a marriage entered by a court in this Commonwealth or any state may, subject to the jurisdictional requirements set forth in 42 Pa.C.S. §§ 5342 (relating to purposes and construction of subchapter) and 5344 (relating to jurisdiction) be modified at any time to an order of shared custody in accordance with the provisions of this section.

Section 3 of the Act, 23 P.S. § 1003, defines "legal custody," "physical custody" and "shared custody" as follows:

"Legal custody." The legal right to make major decisions affecting the best interests of a minor child, including but not limited to, medical, religious and educational decisions.

"Physical custody." The actual physical possession and control of a child.

"Shared custody." An order awarding shared legal custody or shared physical custody or both of a child in such a way as to assure the child or children of frequent and continuing contact, including physical access, to both parents.

In Section 5 of the Act, 23 P.S. § 1005, our courts are granted broad discretion in determining when to order "shared custody," and it is clear that the courts may award such custody sua sponte as long as that award comports with "the best interests of the child."

■ We arrive at the conclusion that shared custody is the best solution for Jesse because of the fulfillment of the four criteria enunciated by the New Jersey Supreme Court in *Beck v. Beck*, 86 N.J. 480, 432 A.2d 63 (1981) and adopted by our Court in *Wesley J.K.*, 299 Pa.Super. at 516, 445 A.2d at 1249: "that 1) both parents are 'fit,' 2) both desire continuing involvement with their child, 3) both parents are seen by the child as sources of security and love, and 4) both parents are able to communicate and cooperate in promoting the child's best interests...."

We proceed to review the record to underscore the fulfillment in this custody determination of all four factors. That both parents are "fit" and that they provide love for their child were at no point controverted in the record. In fact, the lower court found that "[n]o doubt exists that both parties are fit and proper parents." Lower court opinion at 9. Stephen B. Coslett, a clinical psychologist, found that appellant is "an exceptional parent." Notes of Testimony ("N.T.") at 31. He, in fact, portrayed *both* parties as very

competent parents. *Id.* at 31, 47. While Coslett stated a marginal preference for appellant-father, he concluded that they are both fit parents:

> Jesse loves both these people. They are both important to her. I think it's real important that she doesn't think they are divorcing her. Your Honor, I find this a very difficult case, because these parents are both so competent. They are both really neat good parents. I want you to understand that I am not voting against mother. I am simply giving dad another check concerning if it goes to primary custody. I would give the nod to dad. There is a lot of thought and consideration because it's not easy.

*Id.* at 47–48. Coslett also stated that whether or not shared custody was imposed, Jesse should alternate between her parents' two homes for periods of four or six weeks at a time. *Id.* at 51.

Similarly, Richard B. Mason, M.S.W., concluded in his September 23, 1980 report to Judge John W. Keller that "Mr. and Mrs. Smith are both caring and loving parents." In recommending shared custody he stated:

> I cannot help but feel that it would be grossly unfair for Jesse to remove her from her father's care, yet at the same time, I feel that there is no strong reason to deny Mrs. Smith [an] equal amount of involvement in her daughter's life.

In his October 10, 1980 report to Judge Keller suggesting a plan for implementing a shared custody arrangement, Mr. Mason underscored his prior finding that both parties are very competent parents:

> It would appear that both Mr. and Mrs. Smith have a great deal to offer their daughter and it would be a shame for her to be deprived of their influence if it was possible to avoid that. If either of the parents see Jesse only on a visitation basis they will only be able to relate to her as a temporary guest in that home. I often hear visiting parents complain of feeling much like an "entertainer" as opposed to a parent, because of their brief contact with their child and their desire to have everything go smoothly

during their contact. In most instances this cannot be avoided, yet when it appears that a couple is significantly mature and have interest for their children that goes beyond their own personal feelings about the other, joint custody may become a feasible option. Because of the Smiths' daughter's age, (18 months) she will not be ready for kindergarten for another 3 years. During this period of time I feel it would be beneficial for her to spend an equal amount of her life in both the care of her mother and in the care of her father. Because this is a rather new procedure, it is difficult to know just how much time she should spend with each parent and because there is a distance of a few hundred miles [6] involved, this complicates the situation to some extent. Certainly moving Jesse back and forth between her mother and father on a weekly basis would be far too complicated and would not really allow Jesse to become established in either household for any length of time. On the other hand, if one parent had Jesse for 6 months and the other for the next 6 months, I feel that this would probably be too long a period of time and at Jesse's age she would probably quickly forget about or dismiss the absent parent. I do feel that a period of one month to six weeks with each parent might be appropriate. It would be expected that should there be any special events involving extended family members that each parent would have the right and privilege to make minor alterations in scheduling. Joint custody affords a certain amount of flexibility and while it demands a great deal of cooperation on the part of Jesse's parents, it also gives Jesse the opportunity for a living experience with both mother and father, and not only a "visit".

6. At the time of this report recommending shared custody, appellee-mother had moved in with her parents in Danville. She lived with them for six months during which time Jesse remained in Chambersburg with appellant-father. Upon the mother's return to Chambersburg, the parties stipulated to the aforementioned shared custody arrangement.

As noted above, the couple subsequently entered into a shared custody agreement; however, when it became clear that appellant's move to the Allentown area was imminent, he petitioned the court for sole custody. The parties met again with Mr. Mason who concluded that primary custody should be awarded to appellant. While noting that "it is very difficult to make a recommendation when you feel that both parents have the strength and maturity to care reasonably well for their children", Mr. Mason concluded that he was faced with the choice of one or the other. The lower court in its opinion echoed that sentiment: "It is unfortunate in a case where both parents are excellent that one parent must 'lose.' " Lower court opinion at 17. We disagree with the preceding conclusion that one parent must "win" and the other must "lose," and we suggest that Mr. Mason's findings as outlined in the three reports to Judge Keller lead inexorably to the conclusions that both parents are fit and that shared custody is in Jesse's best interests. There was no need for that most difficult of choices.

The second requirement as enunciated in *Beck* and *Wesley J.K.,* that both parents desire continuing involvement with the child, is also fulfilled in the instant case. Each parent sought continued contact with Jesse, and each initially agreed that it was in the child's best interest to spend extended periods with the other. Thus, they initially agreed upon a shared custody arrangement. Neither withdrew in his or her efforts to spend a good deal of time with Jesse. Although father filed on July 2, 1981 a Petition to Modify the Custody Order seeking primary custody and mother also sought primary custody in her Answer, neither balked in expressing profound interest in continuing contact with Jesse.

While the child was only two and one-half years old at the time of the hearing and therefore was not consulted as to feelings about the two parents, it is apparent that she sees them both as sources of love and so the lower court found that "[t]he parties both love the child and the child loves

them." Lower court opinion at 10. Thus, the third factor as enunciated in *Beck* and *Wesley J.K.* is fulfilled.

The fourth factor to be considered is whether the parties are capable of communicating in promoting Jesse's best interests. This clearly does not mean that the parents must be at all times agreeable:

> This feature does not translate into a requirement that the parents have an amicable relationship. Although such a positive relationship is preferable, a successful joint custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared whatever resentments and rancor the parents may harbor.

*Wesley J.K.,* 299 Pa.Super. at 516, 445 A.2d at 1249 (quoting *Beck,* 86 N.J. at 498, 432 A.2d at 71–72).

That these parents stipulated to a shared custody agreement which was reduced to a court order shows significant ability to cooperate on matters of importance to Jesse. We note also that they subsequently agreed to a modification of that agreement which reflected changes in the mother's work schedule.

■ We do acknowledge the presence of some animosity on the part of the father toward the mother. Specifically, he claimed that Sherry drank and smoked in front of Jesse. N.T. at 85. In addition, as the lower court noted, "[t]he father denied her weekend visitation solely because her mother's boyfriend, whom she intends to marry (N.T. 180), would be with the child and the mother for parts of the weekend. (N.T. 66, 170, 191)." Lower court opinion at 11 (footnote omitted). The father also accused the mother of permitting her boyfriend to spend the night with her on two occasions while Jesse was in her home.[7] The mother testified that she does not drink in front of Jesse. She stated that she does smoke, but she does not permit Jesse to do so

---

7. Of course, evidence of this non-marital relationship is not sufficient to deny appellee custody of her daughter. No negative effect of that relationship upon Jesse was established at the hearing. *See Wesley J.K.,* 299 Pa.Super. at 509 n. 4, 445 A.2d at 1245 n. 4 and cases cited therein.

(a rather unlikely activity for a toddler). N.T. at 170. She also admitted that her boyfriend had spent the night on those occasions, but stated unequivocally that Jesse was not aware of his presence. *Id.* at 172. She also stated that her husband told her that because she was involved with this boyfriend, she did not need Jesse. *Id.*

We are not persuaded, as was the lower court, that appellant's complaints about appellee reflect adversely upon his ability to cooperate in promoting Jesse's best interests. Appellant's complaints reflect a fear that he would lose any meaningful opportunity to be with his daughter. This was borne out by the September 23, 1980 report of Richard Mason: "Mr. Smith stated that he felt that unless a strong report was provided by me in his favor he would not have a chance of winning custody of Jesse. He indicated that he felt that because mothers traditionally were given custody of their children, particularly daughters, he would not stand a chance in court unless I stated categorically that he was the one to have primary care for Jesse." We prefer to place emphasis on the cooperation that was apparent before and after their separation. We consider the aforementioned relatively mild attacks upon appellee's character to be aberrations in appellant's behavior and we will not sustain an award of custody to appellee upon those criticisms.

We believe that shared custody is the appropriate disposition in this case and that such a disposition will avert the sense of loss involved in the sole custody arrangement. That sense of loss has been well documented:

> One well-known study of 60 families and 131 minor children aged two through eighteen found that preschoolers feared being abandoned after their parents' divorce, and that children of all ages expressed verbally and behaviorally a great sense of loss if one parent was absent. The same study observed that the effects of being left almost exclusively in the care of only one parent were negative. Another study found that limited visitation by the noncustodial parent severely restricts the opportunity to provide the daily nurturing and comfort needed to strengthen the relationship. Some noncustodial parents,

reacting to the pain of being forced to see their children only intermittently, cope by seeing them infrequently.

Trombetta, *Joint Custody: Recent Research and Overloaded Courtrooms Inspire New Solutions to Custody Disputes,* 19 Fam.L.Q. 213, 217 (1981) (footnotes omitted). In addition, sole custody arrangements are likely to increase conflict between the parties:

> [S]ole custody exacerbates conflict and the children are often used by the mother as a club. The studies we've cited heretofore all deplored the disastrous consequences of parental conflict in the sole-custody household while recognizing the virtues of low conflict *and* the importance of the father's continued and solid involvement with his children. In other words, sole custody seems to work best when it is pretty much akin to joint custody.

M. Roman & W. Haddad, The Disposable Parent 117 (1978) (emphasis in original). Roman and Haddad underscored the need for continued contact with both parents after a divorce:

> The participants at a recent National Institute of Mental Health Conference agreed that continuous, meaningful contact with the non-custodial parent was a critical factor in the child's post-divorce adjustment. Further, all agreed that joint custody was an important and desirable alternative for divorced parents.
>
> For the child, an awareness of his parents' joint involvement is crucial. There is not only the most solid evidence of being loved by both parents, but the chance to express, rather than bury, whatever angers and conflicts the divorce engenders.

*Id.* at 119 (footnote omitted).

The notion of shared custody has been widely misunderstood to require equal time split between the homes of both parents. That misunderstanding stems from an inability to separate two distinct concepts: shared "legal" and shared "physical" custody. We outlined that distinction in *Wesley J.K.,* 299 Pa.Super. 504, 512 n. 8, 445 A.2d 1243, 1247 n. 8 (1982):

Shared custody need not encompass shared "physical" custody: it may constitute merely shared "legal" custody. Shared "legal" custody entails joint input in all major decisions affecting the child, i.e., educational, medical, and religious matters. Shared "physical" custody entails the child splitting his or her time between the two homes. *See* Miller, *Joint Custody,* 13 Fam.L.Q. 343, 360 (1979):

There are two basic versions of joint custody: joint "legal" custody and joint "physical" custody. The former consists exclusively of the shared decision making function. The latter has the additional component of shared residence. That is, under joint physical custody the children live with each parent on an equal or split-time basis. Thus, in a sense, minor as well as major decisions are made by both parents where there is joint physical custody. Examples of these minor matters are what and when to eat, when to do chores, and when to go to bed. In joint legal custody, only one parent has physical custody, and that parent makes these day-to-day decisions.

Thus, the arrangements as to residence may take a variety of shapes; a 50–50 split is certainly not required:

The possible residential arrangements under joint custody are infinite. The time spent with each parent can range from 50–50 (absolute joint physical custody) to 100–0 (absolute joint legal custody). Often a family will experiment with various living arrangements until they find one suitable to their needs, desires, and resources. The frequency of switches also varies substantially. If the parents live far apart, the child may switch homes every six months or even every year. Probably the most common arrangement is based on units of one week; the child spends about four days with one parent and three with the other, switching in the middle of the week and the middle of the weekend. Also common are cycles based on intervals of two weeks, three and one-half days, and four weeks. In a few cases the child changes houses on a daily basis. Some parents speak on the telephone the night prior to each switch; they discuss the child's activities since the previous exchange and perhaps share anec-

dotes that only parents can appreciate. Regardless of what schedule is chosen there is general acknowledgement that some schedule should be adopted, since this mitigates forces causing anxiety and uncertainty for the child. Miller, *Joint Custody,* 13 Fam.L.Q. at 388 (footnotes omitted).

It becomes apparent then that Judge Hoffer's emphasis on the 120 mile distance between the parents' homes was misplaced. While this will make the frequent transfer of custody highly impractical, it certainly does not preclude the awarding of shared custody.

We therefore reverse the order of the lower court and remand with instructions to reinstate shared "legal" and "physical" custody and consider a plan which will reflect the distance between the parents' homes. When Jesse reaches school age, the shared "physical" custody element of the shared custody order will need to be modified to reflect that changed circumstance, but we are confident that the shared "legal" custody arrangement will remain in Jesse's best interests.

Jurisdiction is relinquished.

CAVANAUGH and MONTEMURO, JJ., concur in the result.