**Yates v. Yates**

*Howard J. Bashman* and *Jeffrey Andrew Liebmann,* for appellant.

*Charissa Jacqueline Liller,* for appellee.

GOLDBERG, *J.,* March 7, 2008—Pursuant to the November 20, 2007 opinion and directive of the Superior Court of Pennsylvania, *Yates v. Yates,* 936 A.2d 1191 (Pa. Super. 2007), we address the issues raised in David Yates' concise statement of matters complained of on appeal. This statement essentially raises two areas of alleged error: (1) The appointment of a parent coordinator; and (2) the ordering of joint legal custody of the parties' daughter, A.Y., now age 6.

## I. BACKGROUND

The discord between the parties is complex and the conflicts previously litigated in this court are too numerous to recount. However, to fully understand this court's reasoning in appointing a parent coordinator and in awarding joint legal custody, a review of certain portions of the history of this case is necessary.

The parties separated in October of 2002, before their daughter, A.Y., was 2 years old. While the six years of litigation that followed separation has involved numerous

and varied issues, two significant events warrant elaboration. The first occurred shortly after the parties separated and pertained to a contempt hearing held before the Honorable Alan M. Rubenstein of this court, on January 29, 2003. There, David Yates (Father) alleged that Jackie Yates (Mother) had improperly taken possession of his computers and that she had deviated from an agreed upon custody schedule. As a result of this hearing, Mother's legal and physical custody rights were temporarily revoked, and she was incarcerated for six months subject to purge conditions discussed below. The second event necessitating some background is the recent, extensive settlement discussions conducted by this court which concluded in an agreement of physical custody to Father and also resulted in what this court understood to be a final, global resolution of all remaining issues. We briefly discuss each of these events below.

Litigation started in earnest shortly after separation, when Father filed a petition under the Protection from Abuse Act, alleging he had been pushed by Mother. On October 16, 2002, an order, reached by agreement, was entered, precluding Mother from "abusing, harassing, stalking or threatening Father." This order also provided for "joint legal and physical custody" of A.Y., however, based on the agreed upon schedule, Mother was primary custodian, with Father having custody every Tuesday and Wednesday from 6:30 p.m. to 9:30 p.m., and a two weekend on/one weekend off schedule. This agreed order also required that Mother leave Father's computers and other property at the marital residence. (Final order of court, October 16, 2002.)

On October 21, 2002, Mother filed a motion to reconsider the October 16, 2002 order/agreement, alleging that language barriers prevented her from fully understanding the agreement as it related to the custody schedule.[1] Mother also filed a petition under the Protection from Abuse Act, alleging that Father had slapped her and pointed a gun in her face. An agreement was reached on this petition, prohibiting Father from being present at Mother's residence and further requiring that A.Y. be exchanged by the parties at a local police station. (N.T. 10/30/02, pp. 66-67.)

On October 24, 2002, Father filed a contempt petition claiming that Mother had violated the October 16, 2002 protection from abuse order by not returning his computers and for deviating from the agreed custody schedule. Father did not, however, raise any further "abuse" type issues. A hearing on this petition was held on January 29, 2003, before Judge Rubenstein.

At the outset, Judge Rubenstein expressed concerns and reservations that he was hearing a contempt matter under an alleged violation of a protection from abuse order that, in reality, involved issues regarding marital property and custody visitation, having nothing to do with "abuse." (N.T. 1/29/03, pp. 32-35.) At the conclusion of the hearing, Mother was found in contempt and sentenced to a period of incarceration of six months for not complying with the previously ordered custody

---

1. Mother's native language is French. The procedural history of this case reflects that Mother's language barriers contributed to her misunderstandings and ongoing frustration. (See *e.g.,* Seraydarian evaluation, 4/22/06, pp. 2-3.)

schedule, and for her refusal to allow Father to retrieve his computers. Purge conditions were set, requiring Mother to provide Father an accounting of "personal property presently in her possession and further account for any property and its disposition not in her possession . . . and return to David Yates the computers which were referred to in the testimony." (N.T. 1/29/03, pp. 105-106.) Importantly, because of Mother's incarceration, Judge Rubenstein temporarily awarded total physical and legal custody to Father. While this court had no involvement with this case at that time, we can only assume that in setting a sanction of six months incarceration and a purge condition to return the computers, Judge Rubenstein did not envision that Mother would remain incarcerated for six months.

On March 4, 2003, Mother filed a petition to purge the contempt in order to be released from custody. A hearing was held on April 11, 2003, wherein Mother claimed she returned the two computers. Father acknowledged the receipt of two computers but claimed one was damaged, and the other was not his. Judge Rubenstein rejected Mother's petition and she remained incarcerated for the duration of the six-month sanction. (See generally, N.T. 4/11/03.) When released from custody, Mother had no custody rights, legal or physical.

On October 22, 2003, pursuant to Mother's petition to modify custody, the parties appeared before the Honorable Michael J. Kane and advised that they had selected Dr. Don G. Seraydarian as a custody evaluator. Prior to this hearing, Father had raised allegations against Mother concerning substance abuse as well as prior alleged mistreatment by Mother of her niece who

was under her care for a short time. As will be discussed *infra,* none of these allegations were ever substantiated by Seraydarian nor proven before this court. In any event, with these allegations raised and unresolved, Judge Kane ordered that Mother be allowed visitation with A.Y. for only three hours a week pending the completion of the Seraydarian evaluation. (N.T. 10/22/03, p. 7; report of custody conference officer, 9/15/03.) Thereafter, from October 22, 2003, until the summer of 2006, Mother's visitation rights remained limited. Although she continually sought court intervention to increase her time with A.Y., that issue was placed on hold until the completion of Seraydarian's evaluation.

Seraydarian did not complete a preliminary report until March of 2005, or a final report until April 22, 2006. He attributed a great deal of this delay to an inability to obtain records from the Philadelphia Department of Human Services regarding the alleged negligent supervision by Mother of her niece. According to Seraydarian, the delay was also due to language barriers with Mother, the general discord between the parties, the lack of cooperation by Mother and mistrust between her and Seraydarian. (Seraydarian evaluation, 4/22/06, pp. 1-4; N.T. 11/16/06, p. 77.)

On September 6, 2006, after receipt of further information (including Mother's therapy progress reports and some Philadelphia Department of Human Services records), Seraydarian completed a supplemental report. In the interim, Mother continued to request a modification of custody, however, no substantial changes were made, and Mother continued to have only limited visitation

with A.Y., as the parties awaited Seraydarian's final evaluation.

This court's involvement in this case commenced on June 16, 2006, when Mother filed a motion for an emergency custody hearing, which was held on July 28, 2006. After denying Mother's petition to modify custody until a full custody hearing could take place, hearings were held on September 29, November 16, and December 12, 2006.[2]

As will be detailed below, on February 2, 2007, after extensive settlement discussions had taken place over numerous days, the parties agreed to a physical custody arrangement with Father being the primary custodian and Mother having custody every other weekend and one week night (not overnight). (N.T. 2/2/07, pp. 2-3.) Thereafter, this court issued detailed custody and parent coordinator orders on February 15, 2007.

In summary, although Mother was primary physical custodian after the parties separated and apparently shared legal custody, as a result of the contempt proceedings, she lost all custody rights, was incarcerated for six months and thereafter had minimal contact with her daughter. We view this history instructive when examining Seraydarian's observations of Mother's volatility and her mistrust of him, and the court system. Mother's limited contact with her daughter since early 2003, and her having no legal custody rights during that time period, were also factors we considered in awarding joint legal custody.

2. On October 17, 2006, this court increased Mother's supervised visitation period to five hours per week. (Interim order, 10/17/06.)

What is also important to understand, particularly in assessing this court's decision to appoint a parent coordinator, is that in late 2006 and early 2007, protracted settlement meetings were held with counsel. These efforts were undertaken at the parties' request, in an attempt to end ongoing court battles, create some semblance of civility between the parents, and most importantly, with the best interests of A.Y. in mind. See *Witmayer v. Witmayer,* 320 Pa. Super. 372, 379, 467 A.2d 371, 374 (1983) (the law looks favorably upon the resolution of custody disputes as such resolutions are in the best interests of the child, to spare them "the trauma inherent in an adversarial hearing."). While this court is mindful that these settlement conferences are not of record, we briefly summarize their substance as they touch upon this court's reasoning in appointing a parent coordinator.

At the outset, we note that at all times during these settlement conferences, counsel represented that they had the consent and authority of their respective clients. After numerous meetings with this court, and subsequent discussions with their clients, settlement discussions proved fruitful in that the parties agreed to resolve their major difference—physical custody, with Father maintaining primary physical custody.[3]

With that significant impasse resolved, the attorneys requested that further settlement discussions continue

---

3. During settlement discussions, we recommended that Father maintain primary physical custody. Although custody hearings were never concluded, this court would have, in all likelihood, ruled that under the present circumstances, Father maintain primary physical custody.

regarding other outstanding issues, including the two issues Father has raised on appeal—legal custody and the appointment of a parent coordinator. As these discussions progressed, it became apparent that these issues could not be resolved without further hearings, which may have included the testimony of A.Y. Additionally, neither party had testified or been cross-examined. Both counsel acknowledged that with physical custody having been resolved, further courtroom conflict was not in A.Y.'s best interests. Thus, an alternative scenario was discussed wherein the parties would forego further testimony and present their respective positions in a truncated fashion through oral argument and written submissions. The cornerstone of this proposal included a clear understanding and agreement that while the parties disagreed on the appointment of a parent coordinator and legal custody, for A.Y.'s sake, and in order to achieve an end to litigation, both parents would agree to have this court resolve the remaining issues without the need for any further testimony so that all custody litigation could be fully and finally concluded.

Thereafter, both counsel reported to this court, in the clearest possible terms, that their clients had agreed and assented to this proposal. While it was also understood that Father believed it best that he maintain sole legal custody, and that a parent coordinator was not necessary, his counsel represented to this court that: (1) he recognized that resolution of these issues in the least confrontational fashion was necessary; (2) further testimony, including that of A.Y., was not desired and not in A.Y.'s best interests; and (3) he would abide by and agree to

whatever this court decided and terminate all future custody litigation. Trusting that the parties were making good faith efforts to terminate litigation because they finally understood that it was in A.Y.'s best interests, this court agreed to this proposed resolution.

On February 2, 2007, both parties were placed under oath to review the terms of this agreement. At that time, we simply repeated and affirmed what had been exhaustively covered in settlement discussions.

Given the extensive prior discussions and assurances given to this court, we did not specifically confirm with Father on the record, that this agreement meant an end to all litigation, including the ability to claim error on appeal. While this court's colloquy could have been clearer regarding a waiver of appellate rights, it was stated that "the parties will further agree that whatever detail I add to the order, they will agree to abide by" and that "the parties further agree that whatever order I come up with as to the remainder of the details you will both agree to." (N.T. 2/7/07, pp. 4, 41.) Father assented to both of these statements.

In short, the representations of Father's counsel on numerous occasions, were unequivocal that the proposed agreement meant an end to all custody litigation regardless of what this court decided on the parent coordinator and legal custody issues. Father's continued litigation on this issue is directly contrary to these representations. We urge the Superior Court to consider Father's continued preference for litigation in assessing both whether parent coordination is in the best interests of A.Y. and whether he should have sole legal custody over A.Y.

## II. WAS ORDERING A PARENT COORDINATOR REASONABLE AND IN A.Y.'S BEST INTERESTS

We first address whether the appointment of a parent coordinator was reasonable and in A.Y.'s best interests. Father raises numerous concerns as to why such an appointment was erroneous, all of which, interestingly, pertain to his rights and make no mention of A.Y. Because such an appointment is in A.Y.'s best interests, this court's order appointing a parent coordinator should be affirmed.

In discussing the rationale for parenting coordination, the Association of Family and Conciliation Courts (AFCC) explains that:

"The parenting coordinator role is most frequently reserved for those high conflict parents who have demonstrated their longer-term inability or unwillingness to make parenting decisions on their own, to comply with parenting agreements and orders, to reduce their child-related conflicts, and to protect their children from the impact of that conflict. . . .

"The overall objective of parenting coordination is to assist high conflict parents to implement their parenting plan, to monitor compliance with the details of the plan, to resolve conflicts regarding their children and the parenting plan in a timely manner, and to protect and sustain safe, healthy and meaningful parent-child relationships. Parenting coordination is a quasi-legal, mental health, alternative dispute resolution (ADR) process that combines assessment, education, case management, conflict management and sometimes decision-making functions." AFCC Task Force on parenting coordination, *Guidelines*

*for Parenting Coordination* 2 (2005). In particular, the role of a parent coordinator is described as a "non-adversarial process designed to reduce acrimony and settle disputes efficiently."[4] *Id.* at 11.

In appointing a parent coordinator,[5] we relied heavily on the thorough evaluations prepared by Dr. Don G. Seraydarian,[6] and his subsequent testimony. Seraydarian, an experienced and well respected psychologist,[7] has described the parties' parenting relationship as "highly destructive, inflammatory and hostile." This assessment is consistent with the parties' inability to agree on virtually every custody-related issue. Indeed, the parties have

---

4. On March 5, 2007, the New Jersey Supreme Court approved a parenting coordinator pilot program for four judicial districts. This program allows a court to appoint a parent coordinator at any time during a case involving minor children after finding good cause or upon agreement of the parties. (N.J. Supreme Court parenting coordinator pilot program implementation guidelines, March 5, 2007.) In addition, the legislatures of North Carolina and Oklahoma have adopted statutes to allow for the appointment of a parent coordinator. Under both statutes, a court may appoint a parent coordinator despite a party's objection where the appointment is in the best interests of the child and the case contains a high level of conflict. N.C.G.S. §50-91; 43 Okl. St. §102.3.

5. Natalie L. Famous of Fox Rothschild, a highly respected Bucks County attorney whose practice is focused solely on family law, was appointed as the parent coordinator.

6. All of Seraydarian's reports and attachments were introduced into evidence as exhibit F-1.

7. Seraydarian specializes in family counseling, as well as adolescent psychology and forensic psychology. Seraydarian has 21 years of experience in this field and has been qualified as an expert in custody matters 40 to 50 times. His evaluation of A.Y. has been ongoing from 2003 to 2006. He has met with Mother, Father and A.Y, and conducted home visits and various psychological tests. (N.T. 9/29/06, pp. 42-50; exhibit F-2.)

been active litigants in this court, with the docket sheet reflecting 52 entries on issues relating to custody, contempt, and petitions filed and withdrawn by both parties under the Protection from Abuse Act. (See generally, B.C.C.P. docket no. A06-02-63378-A, C.) Litigation has continued unabated to the present date, with Father's most recent filing on October 29, 2007, of a petition for contempt. (B.C.C.P. docket no. A06-02-63378-C, 10/29/07.)

Throughout his evaluation and in his testimony before this court, Seraydarian described the level of conflict between Mother and Father as extremely high, even "catastrophic." (Seraydarian evaluation, 9/6/06, pp. 2, 3, 22, 28, 33; N.T. 9/29/06, pp. 59-60.) According to Seraydarian, this conflict is fueled by an intense level of animosity between the parents, who consistently accuse each other of lying, manipulating and distorting the truth. (Seraydarian evaluation, 9/6/06, pp. 2, 31.)

Among a variety of troubling interactions, Seraydarian observed Mother verbally attacking Father, and Father's passive-aggressive behavior towards Mother. (Seraydarian evaluation, 9/6/06, p. 9; N.T. 9/29/06, pp. 59-60.) According to Seraydarian, conversations between the parents turn to attack and defend, wherein they cannot agree on even the most basic of issues. (Seraydarian evaluation, 9/6/06, pp. 3, 22, 38.)

With this relationship in mind, Seraydarian strongly recommended the appointment of a parent coordinator, whose role would be to resolve minor conflicts between the parties and ensure that their co-parenting plan is implemented. Seraydarian made this recommendation, in part, out of fear that A.Y. would otherwise be harmed,

stressing that she remains at a high risk because of the adversarial nature of her parents. (Seraydarian evaluation, 9/6/06, pp. 33, 35.) His report notes that for a child to reach their full potential, it is important to have a close and loving relationship with both parents, and that chronic hostility between parents can be destructive to the child. (Seraydarian evaluation, 9/6/06, p. 30.) Indeed, in his interactions with A.Y., Seraydarian observed that she is aware of the conflict that exists between her parents, and has identified the conflict as a source of anxiety. (Seraydarian evaluation, 9/6/06, p. 8.)

After a thorough and exhaustive evaluation and analysis of the parents' relationship and how that affects A.Y., Seraydarian set forth several specific recommendations, including the following:

"At the present time, both Mr. and Mrs. Yates have no ability to communicate with each other in a positive or productive manner. It is *imperative that they be involved with a parent coordinator,* who would not only attempt to improve communication between Mr. and Mrs. Yates, but would act as a resource to assist both Mr. and Mrs. Yates in resolving minor conflicts and to assure that their parenting plan is appropriately implemented." (Seraydarian evaluation, 9/6/06, p. 35.) (emphasis added)

Despite an objective, well-qualified psychologist's opinion that the appointment of a parent coordinator is *"imperative"* for A.Y.'s well-being, and this court's additional, objective view that such appointment is in A.Y.'s best interests, Father claims error in such an appointment. He does so even after his counsel represented that, although he would prefer a coordinator not be appointed, he would abide by whatever this court determined was

in A.Y.'s best interests. Specifically, Father alleges error in that: (1) the appointment of a parent coordinator was an improper delegation of judicial authority; (2) the appointment empowered the parent coordinator to determine when he can communicate and "how and when to spend money"; (3) "the appointment provided quasi-judicial immunity" to the parent coordinator; and (4) it was error to require Father "pay for the vast majority of the substantial and potentially unlimited fees and cost of the 'parent coordinator.'" (Appellant's concise statement, ¶2.) We address these claims below.

Father first asserts that the appointment of a parent coordinator was an improper delegation of judicial authority. Father has, at no time previously, whether at oral argument, in his motion for reconsideration or in his 1925(b) statement, offered any legal precedent to support this assertion, and indeed, several provisions governing Pennsylvania family law are contrary to this position.

Courts can permissibly, and do routinely, delegate functions in domestic matters, and have the authority to appoint various professionals. For instance, pursuant to 23 Pa.C.S. §5305, courts may require parents to attend counseling sessions and may consider the recommendations and report of the counselor in making its custody determination. See also, 23 Pa.C.S. §3302 (defining the procedure for court-appointed counseling in a divorce proceeding). In addition to mental health professionals, in a divorce or annulment action, a court may also appoint a master to hear testimony, facilitate an agreement, and make a recommendation to the court. 23 Pa.C.S. §3321; Pa.R.C.P. 1920.51; see also, *Wolf v. Wolf,* 356 Pa. Super. 365, 371, 514 A.2d 901, 903-904 (1986) (master

in divorce action has authority to take evidence on claims of unjust enrichment and recommend judgment); *Decker v. Decker,* 192 Pa. Super. 234, 237, 160 A.2d 242, 244 (1960) (in view of crowded court docket, master appointed to hear contested divorce); *Herwig v. Herwig,* 279 Pa. Super. 65, 70, 420 A.2d 746, 748 (1980) (master's report to be given fullest consideration especially on issues of credibility of witnesses); *Bristol v. Baranyi,* 259 Pa. Super. 418, 393 A.2d 897 (1978) (where divorce case amounts to one party's word against another, with no corroborative evidence, appellate court should accord great weight to master's findings).

Similarly, in support matters, the action begins with an office conference followed by the involvement of a hearing officer, who submits a report and recommendation to the court. An interim order is then entered consistent with the hearing officer's proposed order. Pa.R.C.P. 1910.11, 1910.12; 23 Pa.C.S. §4342(a). Likewise, in the custody context for partial custody and visitation actions, a hearing officer or conference officer may hear the dispute first, receive evidence and prepare recommendations. If either party files exceptions to these recommendations, the court then hears arguments and enters an appropriate order. Pa.R.C.P. 1915.4-1, 1915.4-2, amended by 2007 Pennsylvania court order 46.

The above procedures and precedent demonstrate that there is ample authority for this court's delegation of limited and specific duties to qualified third parties in domestic matters.

Consistent with the examples of limited delegated authority discussed above, the parent coordinator's role in this case has been significantly limited by our Febru-

ary 15, 2007 custody and parent coordinator orders. First, the custody order addressed physical custody, an issue strictly beyond the authority of the parent coordinator. This order specifically prohibits any changes to legal or physical custody, and any substantial changes to the custody schedule. This order also addressed: (1) times when custody should be transferred, (2) a detailed holiday schedule, procedures for vacations and how the vacation schedule will affect the physical custody schedule, (3) a procedure for any changes of address, (4) a procedure on the dissemination of information related to school, medical and religious issues, (5) telephone access with A.Y., and (6) procedures during an emergency. Thus, the majority of details surrounding physical and legal custody of A.Y. were specifically addressed by this court and not delegated to, or left to the discretion of the coordinator. (Custody order, 2/15/07.)

The parent coordinator order is also very detailed and limits the coordinator's authority to resolving disputes to areas such as:

"—Temporary variation from the custody schedule for a special event or particular circumstance;

"—Minor long-term adjustments to the physical custody schedule as set forth in the custody order, not to exceed two days per month;

"—Child's participation in recreation, enrichment, and extracurricular activities, programs and travel;

"—Child-care arrangements;

"—Clothing, equipment, toys and personal possessions;

"—Discipline and behavior management of the child;

"—Information exchange (school, health, social, etc.) and communication about the child;

"—Arrangements for health care reimbursements;

"—Clarification of provisions in the court's February 15, 2007 order including, but not limited to holiday and vacation plans;

"—Communication with the child when she is in the other household; and

"—Other related custody issues as the parties mutually agree, in writing, to submit to the parent coordinator." (Order for parent coordinator, 2/15/07.)

Consequently, this court has maintained authority over the majority of custody issues and provided the parent coordinator with decision-making discretion only on minor custody and visitation issues. As such, Father's concerns that this court has improperly delegated judicial authority are unfounded.

Moreover, contrary to Father's assertions, the parent coordinator's decisions are not exempt from judicial review. Paragraph 8(B) of the parent coordinator order provides for such review and states:

"If a party continues to object to a decision by the parent coordinator, that party may file with the court a motion for review attaching a copy of the decision, the report (if any) and stating the objections with clarity. The decision shall remain in effect until changed by the court. There shall be no trial de novo on issues decided by the parent coordinator within the scope of his authority as

set forth in paragraph 3 above. The court will make an independent determination (following an evidentiary hearing if necessary) whether the parent coordinator's decision is contrary to fact or the law, which shall be the only grounds for review. The burden of proof shall be on the moving party. The court may delegate such review to its regularly appointed master or conciliator where it deems appropriate."

This section provides clear and unequivocal review by the court of any decision made by the parent coordinator.

In his section 1925(b) statement, Father also complains that our order precludes de novo review[8] of a parent coordinator decision. Our rationale in precluding de novo review, was to provide the coordinator with enough authority to encourage and foster dispute resolution without having to constantly resort to litigation. This court does not, however, object to a modification of our February 15, 2007 order to allow for de novo review. Our objective in ordering a parent coordinator was to implement a badly needed alternative method of dispute resolution for the parties. As such, whether this court's review of the decisions of the coordinator is de novo, abuse of discretion, error of law or otherwise, is of minimal importance.

Father also argues that this court erred in appointing a parent coordinator because the coordinator's decisions

---

8. De novo review is an appeal in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings. Blacks Law Dictionary, 7th edition.

will be enforceable by means of contempt. Father never raised this issue prior to our appointment of a coordinator, or in his motion for reconsideration. Nonetheless, under our order, after the parent coordinator makes a decision, an unsatisfied party can immediately seek review from this court, and do so prior to any contempt allegation being litigated. Should this court agree and affirm the parent coordinator's decision, and the alleged contemptuous conduct continues, any subsequent contemptuous conduct would be based upon a violation of a court order, not the decision of the parent coordinator. In any event, even under the rare scenario where a contempt hearing would be based on a decision of the coordinator, the court would still have to assess the alleged contemptuous conduct in conjunction and in context with the actual decision of the coordinator. Thus, both the parent coordinator's decision and the alleged contemptuous conduct would remain under the purview of the court.

Father further claims that this court committed a constitutional error by empowering the parent coordinator to dictate "how and when to communicate and spend money." Like the claims discussed above, Father has failed to explain what constitutional rights have been violated. This court ordered the appointment of a parent coordinator with the best interests of A.Y. in mind, and any decisions by the coordinator affecting Father's ability to "communicate" or "spend money," are always subject to judicial review.

Father also asserts that we erred by granting the parent coordinator quasi-judicial immunity. Protecting Father's right to initiate more litigation against the parent coor-

dinator, is not in the best interests of A.Y. Due to the overly litigious nature of the parties, this court determined that such immunity was necessary in order to find a willing coordinator. The fact that this immunity may diminish Father's unspecified litigation rights do not outweigh the best interests of A.Y. in having some type of alternative dispute resolution.

Father further objects to the parent coordinator's fee arrangement, complaining that he may be responsible for the "vast majority of the substantial and potentially unlimited fees." While it is true that the order allocates 90 percent of fees to Father, based on his significantly superior earning capacity, such fees are "subject to re-allocation by the parent coordinator if the coordinator determines that one party has disproportionately caused the need for the service or has raised frivolous issues in bad faith." (Parent coordinator order, ¶11.) The parent coordinator's re-allocation of fees is also reviewable by this court. Thus, our order protects Father from being charged the vast majority of unlimited fees, where frivolous issues are raised.

In summary, the protracted and highly contentious nature of the parties' interaction regarding the custody of their daughter is indisputably not in the best interests of A.Y. It is clear that the parties are unable to conduct themselves civilly and cooperatively. Seraydarian stressed that parent coordination is "imperative." Therefore, this court's appointment of a parent coordinator to facilitate effective, civil communication and dispute resolution between the parties, was a reasonable and prudent decision based on the facts of this case.

## III. LEGAL CUSTODY

Father also claims error in our awarding shared legal custody. For numerous reasons discussed below, the awarding of joint legal custody is in A.Y.'s best interests.

Generally, appellate court review of a trial court's child custody order is one of abuse of discretion. *Johnson v. Lewis,* 870 A.2d 368, 371 (Pa. Super. 2005). However, an "abuse of discretion" in the context of child custody does not consist merely of an error in judgment; it exists only when the trial court overrides or misapplies the law in reaching its conclusion or when its judgment is manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by the evidence of record. *Speck v. Spadafore,* 895 A.2d 606, 609 (Pa. Super. 2006). The ultimate test is "whether the trial court's conclusions are unreasonable as shown by the evidence of record." *Id.* The broad scope of review attendant to custody matters does not confer upon the reviewing court the license or privilege of making independent factual determinations, nor does it authorize the reviewing court to substitute its judgment for that of the trial court. *T.B. v. L.R.M.,* 753 A.2d 873, 881 (Pa. Super. 2000).

Legal custody is defined statutorily as, "the legal right to make major decisions affecting the best interests of a minor child, including, but not limited to, medical, religious and educational decisions." 23 Pa.C.S. §5302. In considering legal custody, any factor that legitimately might impact the physical, intellectual and emotional well-being of the child should be considered. 23 Pa.C.S.

§5303. Shared legal custody may be awarded in the discretion of the court when it is in the best interest of the child. 23 Pa.C.S. §5304.

In discussing the advantages of shared legal custody, the court in *In re Wesley J. K.*, 299 Pa. Super. 504, 445 A.2d 1243 (1982), stated:

"The philosophic premise of shared custody is the awarding to both parents of responsibility for decisions and care of the child. In the past non-custodial, conscientious parents have been frustrated by the second-class status to which the law has assigned them. . . . Shared custody allows both parents input into major decisions in the child's life." *Id.* at 512, 445 A.2d at 1247.

Joint legal custody also ensures neither parent has a superior legal advantage. Allowing both parents to have established legal rights regarding the child's welfare can reduce animosity. *Id.* at 516, 445 A.2d at 1249. Thus, shared legal custody creates a more natural familial relationship between the parents and child. *Id.* at 512, 445 A.2d at 1247.

In awarding shared legal custody, a court should consider whether: (1) both parents are capable of making child-rearing decisions; (2) both parents' desire for continued active involvement in the child's life; (3) the child finds both parents as sources of love and security; and (4) there is a minimal degree of cooperation between the parents. *Id.* at 517, 445 A.2d at 1248-1249. We address each factor below.

## *Both Parents Are Capable of Making Child-Rearing Decisions*

It should initially be noted that despite his recognition of the conflict between the parties, Seraydarian stressed the benefits of having both parents involved in a child's life, and in fact, recommended shared legal custody.[9] (Seraydarian evaluation, 9/6/06, p. 37.)

Moreover, Father has never questioned Mother's ability to make decisions regarding medical, religious or educational decisions. Indeed, in his submissions prior to the custody order, in his reconsideration motion or his 1925(b) statement, Father never specified why Mother is incapable of making child-rearing decisions.

Further, significant evidence supports this court's conclusion that Mother is capable of making appropriate decisions regarding A.Y.'s upbringing.[10] First, two custody supervisors who witnessed Mother's weekly interactions with A.Y. each Sunday from 2004 through 2006 both testified positively regarding Mother's fitness as a parent. Specifically, Mary Ann McOwen, who acted as the first supervisor, reported that Mother and A.Y. had a normal, good relationship, and observed the two play affectionately. McOwen expressed no concerns with Mother's parenting. (N.T. 7/28/06, pp. 7-8.)

---

9. This court recognizes that this recommendation was premised on a transitional timetable where Mother would first have supervised, then unsupervised custody before alternating weekends of physical custody. However, Father, knowing this recommendation, agreed to forego these "stages" and allow Mother alternating weekends.

10. Because the custody issues were resolved prior to the conclusion of the hearings, there is no testimony of record from either party.

Diane Iuliano, the supervisor that followed McOwen, similarly testified that she did not notice any parenting problems with Mother, and described the relationship between Mother and A.Y. as very loving, caring and motherly. (N.T. 7/28/06, pp. 21-23; N.T. 9/29/06, p. 16.) Iuliano observed that the relationship was a typical mother-daughter relationship, including Mother's method of discipline. (N.T. 9/29/06, pp. 21-22.) In addition to Mother's contact with A.Y., Iuliano observed Mother's interactions with her (Iuliano's) grandchildren and Mother's niece. Iuliano positively described all of these relationships. (N.T. 9/29/06, pp. 18, 23-24.)[11]

Sister Jamie Silvano, who arranged for the two supervisors discussed above, noted that she found Mother to be cooperative and stated that "she was very obedient of what they asked her." It was also her impression that "Ms. Yates has been treated horribly and that all of the legal maneuvering was unnecessary." (Seraydarian evaluation, 9/6/06, p. 14.)

Dr. William W. Greenfield, who has supervised Mother's therapy since July of 2005, also testified about positive strides achieved by Mother. (N.T. 11/16/06, p. 94.) First, despite allegations raised by Father regarding drinking issues, neither Greenfield nor Mother's therapist detected any alcohol problems, nor have they seen any evidence of anger management problems with Mother. In fact, Greenfield testified that he was impressed by Mother's ability to deal with stress. (N.T. 11/16/06, pp. 96-100.) While Greenfield did indicate that Mother suffers from post-traumatic stress disorder and major depressive disorder, he emphasized that she has improved over

---

11. Both Iuliano and McOwen knew Mother through church.

the course of the treatment and that both conditions are under control.[12] (N.T. 11/16/06, pp. 94, 112.) Thus, those persons who had had the most recent contact with Mother and observed her interactions with A.Y., all reported many positives regarding her parenting and improved mental health.

Father will undoubtedly focus on selected portions of Seraydarian's report and testimony to further his argument that in addition to having primary physical custody (which Mother agreed to), he be given sole legal custody. While Seraydarian did raise concerns regarding Mother, he ultimately recommended joint legal custody and raised concerns about *both* parents. For instance, Seraydarian noted that both parents have engaged in "distortions" and have accused the other of "lying, manipulating and distorting the truth." (Seraydarian evaluation, 9/6/06, p. 2.)

Seraydarian's concerns regarding Mother included her being overly emotional; that she suffers from depression and anxiety, which may manifest as a personality disorder; and that she was "quite mistrustful" of Seraydarian and the judicial system. (Seraydarian report, 9/6/06, pp. 5, 10-11, 19, 25.) However, several troubling traits were also raised regarding Father, including his passive-aggressive tendencies; a "Machiavellian" approach to interactions with Mother; a propensity to attack Mother in a hostile manner; and his continued desire to exchange A.Y. at a police station. (Seraydarian report, 9/6/06, pp. 9, 22; N.T. 9/29/06, pp. 190-91.) Regarding

---

12. Regarding Seraydarian's analysis of Mother, Dr. Greenfield cautioned that the poor rapport between Seraydarian and Mother may have affected Seraydarian's assessment. (N.T. 11/16/06, pp. 103-104.)

this ongoing litigation, Seraydarian noted that Father is "consumed with his estranged wife and building a case against her" and that he "appears to utilize his passive-aggressive tendencies to gain the upper-hand with his estranged wife." (Seraydarian evaluation, 9/6/06, pp. 31-33.)

In short, sifting through the complexities of the parties' relationship reveals varying levels of dysfunction on the part of both parties. What is clear, however, is that neither parent has clean hands as it relates to their overall ability to parent.

The other major concern regarding Mother, discussed extensively in the Seraydarian evaluation which Father may focus on, pertains to allegations that she exhibited inappropriate supervisory skills during the spring and summer of 2003 while charged with the care of her niece, Jeanne Seyi, and that she has a drinking problem. These *allegations* involved claims of abuse committed not by Mother, but by Seyi's maternal uncle. Importantly, both in his report and during testimony, Seraydarian stressed that despite extensive inquiries, he has "not been able to validate or disprove these accusations," and that these allegations were "unsubstantiated" and "unexplained." (Seraydarian evaluation, 9/6/06, pp. 25, 29, 33.) This court also found these allegations to be unproven, even to a small degree of reliability. While Seraydarian was appropriately concerned about these allegations, they did not stop him from recommending a larger physical custody role for Mother and eventual joint legal custody. (Seraydarian evaluation, pp. 25, 37.)

Finally, Seraydarian's recommendations on a physical custody plan, while set out in stages, does ultimately recommend that Mother have physical custody of A.Y.

on an alternating weekend basis and a one evening per week dinner. This is the exact plan that Father knowingly agreed to when this matter was resolved on February 2, 2007. Seraydarian also recommended that during summer months, Mother be granted primary physical custody of A.Y. for a six-week period of time. (Seraydarian evaluation, 9/6/06, pp. 37-38.) Given these expert recommendations of significant periods of sole physical custody to Mother, this court's decision to allow her an equal voice in areas of religion, education and health is not at all unreasonable.

### Mother Has a Strong Desire for Continued, Active Involvement in A.Y.'s Life

There is also sufficient evidence indicating that Mother strongly desires continued involvement with A.Y. She testified about an existing, strong relationship with A.Y., and continually stressed that she would like more time with her. (N.T. 7/28/06, pp. 45-46.) Mother's desire for a more active involvement was further evidenced by her eventual request for physical custody to be divided equally. (N.T. 9/29/06, pp. 55-57, 103.) Dr. Seraydarian also testified regarding phone calls from Mother complaining that she cannot live without Daughter. (N.T. 9/29/06, p. 188; Seraydarian evaluation, 9/6/06, p. 22.) Despite her utterly unpleasant experience with the judicial system, we find that Mother continues to strive to have active, meaningful involvement in A.Y.'s life.

### Mother Is Source of Love and Security to A.Y.

Evidence was also presented that A.Y. considered Mother a source of love and security. Both in his report and testimony, Seraydarian acknowledged that A.Y., "reported good relationships with both of her parents," and

she "perceived both of her parents as being a source of support and love for her." (Seraydarian evaluation, 9/6/06, p. 8; N.T. 9/29/06, pp. 51-52.) The testimony of the custody supervisors, referred to above, describing the loving and affectionate relationship between Mother and Daughter also reflects that Mother is a source of love and security for A.Y. (N.T. 9/29/06, p. 16; N.T. 7/28/06, pp. 7-8.)

### Minimal Cooperation Between the Parents Can Be Achieved

The final factor for shared custody as required by *Wesley,* is that there must be some minimal degree of cooperation between the parents. *Id.* at 516, 445 A.2d at 1249. It is not required that the parents have an amicable relationship, but they must be able to isolate their personal conflicts from their roles as parents so that the child is not harmed by the conflict. *Id.* Given the conflict between the parties, this issue is the greatest concern as it relates to joint legal custody.

In *Brown v. Eastburn,* 351 Pa. Super. 479, 506 A.2d. 449 (1986), the court found that: (1) the parties' willingness to agree to a shared physical custody arrangement; (2) the fact that they had engaged in a significant amount of negotiating and compromising regarding the implementation of shared custody; and (3) the fact that experts had recommended shared custody, were all factors indicative of cooperation. *Id.* at 481, 506 A.2d at 450. See also, *Smith v. Smith,* 307 Pa. Super. 544, 554, 453 A.2d. 1020, 1025 (1982) (fact that parents stipulated to shared custody arrangement shows significant ability to cooperate).

Here, although the prior parenting history is replete with conflict, recently, the parties have agreed on the

most important and previously most contentious issue, physical custody. This agreement came after extensive negotiation and compromise by the parties. Under *Brown,* these are two important factors in considering whether there will be a sufficient amount of cooperation between parents to award joint legal custody. Regarding the third factor in *Brown,* the selected expert, Dr. Seraydarian, has also recommended shared legal custody.

Additionally, our custody order of February 15, 2007, goes to great lengths to set out all details regarding physical custody, and includes a requirement that the parties enroll in co-parent counseling which was ordered to "improve and facilitate future interactions between the parties in an amicable fashion." In conjunction with awarding shared legal custody, a detailed parent coordinator order was also issued, based on Seraydarian's recommendations that, "it is imperative that [Mother and Father] be involved with a parent coordinator, who would not only attempt to improve communication between Mr. and Mrs. Yates, but would act as a resource to assist both Mr. and Mrs. Yates in resolving minor conflicts and assure that their parenting plan is appropriately implemented." (Seraydarian evaluation, 9/6/06, p. 35.) In accepting and crediting these recommendations, we agreed with Seraydarian that a parent coordinator would serve to resolve minor conflicts between the parents and provide a minimal level of cooperation between the parties, as required by *Wesley.*

Finally, despite his recognition of the conflict between the parties, Seraydarian notes the benefits of having both parents involved in a child's life. (Seraydarian evaluation, 9/6/06, pp. 30, 37.) We placed great weight on this recommendation as Seraydarian has been in the best position

to understand what is in A.Y.'s best interests. Moreover, with the physical custody arrangement set up as primary/partial, shared legal custody will instill more normalcy and hopefully help to reduce the stress and conflict that has afflicted this family for the last six years. Excluding Mother from having a voice in educational, religious or other important aspects in A.Y.'s life would only create further frustration and alienation. In this instance, we agree with the view that the need to reach an agreement on major child-rearing decisions where both parents are on equal footing can create "an atmosphere of détente rather than hostility." David J. Miller, *Joint Custody,* 13 Fam. L.Q. 345, 364 (Fall 1979).

In weighing all of the pertinent factors regarding legal custody, this court did not overlook the fact that Mother spent six months incarcerated for her refusal to return property and for deviations from custody schedules. This does not, however, necessitate that she be precluded from having an equal say in her daughter's education, religion or health-related issues, particularly when she has lost primary physical custody. We were persuaded by the witnesses who observed Mother interact with her daughter, the progress Mother has made in therapy and the steps Mother has taken on her own behalf, such as parenting classes and, of course, Seraydarian's recommendations. Mother's incarceration did not affect her desire to be involved in A.Y.'s life, nor did it apparently affect A.Y.'s perception of Mother as a loving source of security.

## IV. CONCLUSION

For the reasons stated herein, the appointment of a parent coordinator and awarding joint legal custody was proper and in A.Y.'s best interests.